2016 IL App (4th) 120721-B
NO. 4-12-0721

**FILED**
May 26, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JOSEPH W. WARREN, | ) | No. 11CF443 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion. Justices Appleton and Pope concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a May 2012 trial, the jury found defendant guilty of unlawful possession with the intent to deliver a controlled substance, a Class 1 felony (720 ILCS 570/401(c)(2) (West 2010)) (count I), and unlawful possession of a weapon by a felon, a Class 3 felony (720 ILCS 5/24-1.1(a), (e) (West 2010)) (count II).   In July 2012, the trial court sentenced defendant to a 30-year term on count I and a concurrent 10-year term on count II.   Defendant appealed, arguing (1) the State failed to produce sufficient evidence to sustain his conviction on count I; (2) he was entitled to a vacation of certain assessments imposed pursuant to his conviction; and (3) he was entitled to additional sentencing credit for time served.   In June 2014, we affirmed in part, vacated in part, and remanded with directions.   *People v. Warren*, 2014 IL App (4th) 120721, ¶ 1, 16 N.E.3d 13.   Defendant filed a petition for leave to appeal with the Supreme Court of Illinois.

¶ 2        On January 20, 2016, the supreme court denied defendant's petition for leave to

appeal but issued a supervisory order (*People v. Warren*, No. 118322 (Ill. Jan. 20, 2016)

(nonprecedential supervisory order)) directing this court to vacate our prior judgment and

reconsider our decision in light of *People v. Castleberry*, 2015 IL 116916, 43 N.E.3d 932.   In

accordance with the supreme court's direction, we vacate our prior judgment and reconsider in

light of *Castleberry* to determine whether a different result is warranted.   We again affirm in part,

vacate in part, and remand with directions.

¶ 3                                I. BACKGROUND

¶ 4        On March 21, 2011, the State charged defendant with unlawful possession with

intent to deliver a controlled substance and unlawful possession of a weapon by a felon.   The

charges arose from a traffic stop and later search of a hotel room rented by defendant.

¶ 5                                A. The Traffic Stop

¶ 6        On March 18, 2011, Officer Jeremiah Christian of the Champaign police

department, who was assigned to the Community Action Team, observed defendant driving a

green Oldsmobile Bravada.   Upon recognizing defendant as the driver, Officer Christian

"conducted surveillance to see where [defendant] was going."   Officer Christian followed

defendant to the Red Roof Inn on Anthony Drive.   Officer Christian observed defendant exit his

vehicle and enter a guest room at the hotel.   Officer Christian then left the area to meet with other

members of the Community Action Team.

¶ 7        The team formulated a plan to return to the area around the hotel to continue

surveillance on defendant's activities.   If defendant was observed leaving the hotel, an officer

would follow and wait for defendant to commit a violation of the Illinois Vehicle Code (625 ILCS

- 2 -

5/1-100 to 20-402 (West 2010)). The officers would then stop the vehicle and further their investigation.

¶ 8         Officer Christian returned to the hotel to continue his surveillance. At some point during his surveillance, Officer Christian observed defendant return to the Oldsmobile Bravada. He was accompanied by a white female, later identified as Kimberly Rosas. Defendant drove the vehicle away from the hotel and headed toward Neil Street. Officer Christian went to hotel management to see whether defendant had rented a room at the hotel. Officer Christian learned defendant had been renting a room at the hotel since March 8, 2011. The rental agreement listed only defendant's name. Officer Christian then went to the room and stood watch to ensure nobody entered or left the room. Shortly thereafter, Officer Phillip McDonald observed defendant commit a traffic violation while turning right onto Neil Street and initiated a traffic stop at the intersection of Neil Street and Interstate 74. Several other Champaign police officers, including Katherine Thompson, Marshall Henry, and Robert Sumption, arrived on the scene to provide backup.

¶ 9         Officer McDonald approached the vehicle and asked defendant to shut off the car. He detected an odor of cannabis emanating from the vehicle. Officer Henry also detected the odor of cannabis. Because the officers detected the odor of cannabis, Officer McDonald asked defendant to step out of the vehicle so it could be searched. Defendant responded by attempting to lock the driver's door and reaching for the key still in the ignition. Officer McDonald then reached inside the car and grabbed defendant's arm. Officer Henry assisted Officer McDonald in removing defendant from the vehicle. After the officers removed defendant from the vehicle, a lengthy struggle ensued, and defendant resisted the officers' attempts to place him under arrest.

¶ 10    During this struggle, Officer Sumption asked Rosas whether anything illegal was located inside the car.   At first she indicated there was not, but she later informed the officer a gun was in her purse.   This prompted Officer Sumption to draw his weapon and point it at Rosas.   Officer Sumption relayed this information to the other officers at the scene.   Officer Sumption then removed Rosas from the vehicle and placed her under arrest.   She was escorted to the backseat of Officer Thompson's squad car.   Officer Sumption removed the gun from Rosas's purse and determined the gun was loaded with a magazine containing six rounds of .25-caliber ammunition.   He also determined no rounds were in the weapon's chamber.   While sitting in the backseat, Rosas told Officer Sumption defendant carried the purse containing the handgun to the vehicle.

¶ 11    B. Rosas's Postarrest Interview

¶ 12    As Officer Thompson escorted Rosas to her police car, she asked Rosas whether she had anything "crotched," meaning concealed within her undergarments or inside her vaginal or anal cavity.   Rosas stated she did not.   While seated in the back of the police car, Rosas told Officer Sumption that defendant carried the gun in her purse to the car.   Rosas told Officer Sumption approximately half an ounce of crack cocaine was located in the hotel room.   Rosas was then transported to the Red Roof Inn to confirm the location of the room in which she and defendant had been staying.

¶ 13    Officer Thompson transported Rosas to the Champaign police department to speak with Officer McDonald.   After being informed of and waiving her *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), Rosas stated she had a current addiction to crack cocaine.   Officer McDonald inquired about the gun recovered during the traffic stop.   Rosas stated defendant had

the gun in his waistband until Officer McDonald initiated the traffic stop, when defendant placed the handgun in Rosas's purse.

¶ 14        Rosas then expressed her concern over going to jail.   After Officer McDonald assured Rosas she would not go to jail, Rosas stated, "I'll do anything that you want me to do.   I'll be helpful, you know, as long as I don't go to jail."   Rosas then detailed the drug-dealing operation defendant was running from the hotel room.   Defendant would bring large quantities of crack cocaine to the room and break it down for sale.   He used a black scale to assist him in breaking down the product.   Defendant would then package the individual pieces for sale.   Once packaged for sale, defendant would place the individually wrapped pieces of crack cocaine in a plastic bag and "go deal."

¶ 15        Rosas believed defendant was bringing at least four ounces of crack cocaine to the room per day to package for sale.   She further believed at least a half-ounce of crack cocaine would be found in defendant's black duffel bag inside the room and more would be found outside the hotel room.

¶ 16        Rosas then asked to use the restroom.   Officer Thompson, who stood by during the interview, escorted Rosas to the restroom.   While there, Rosas told Officer Thompson she had crack cocaine concealed inside her vagina.   Officer Thompson looked into the toilet and observed a plastic bag containing what appeared to be individually packaged pieces of crack cocaine. Officer Thompson informed Officer McDonald of what she discovered.

¶ 17        Rosas returned to the interview room, where Officer McDonald was to take a statement regarding the crack cocaine discovered during Rosas's bathroom break.   When asked how the crack cocaine came to be concealed within her vagina, Rosas initially told Officer

McDonald that defendant physically placed the cocaine inside her vagina just before the traffic stop. Rosas assured Officer McDonald she was being truthful. Rosas stated this was her first time out dealing with defendant. She also stated defendant wanted her to accompany him because he had the gun, but she was not sure whether he wanted her there to take blame for the gun.

¶ 18    After about 15 minutes, Officer McDonald again asked Rosas to speak with him. Officer McDonald sought clarification as to how the crack cocaine came to be concealed within Rosas's vagina. This time, Rosas stated defendant handed her the bag containing crack cocaine and ordered her to conceal it in her vagina just before the traffic stop. Defendant told her she would be sorry if she did not do so. Rosas then placed the crack cocaine inside her vagina. Additionally, Rosas told police the last time she smoked crack was just before she and defendant were arrested.

¶ 19                              C. Search of the Hotel Room

¶ 20    After Rosas was interviewed, she was asked to swear to an affidavit in support of a search warrant. The affidavit stated Rosas was with defendant when his Oldsmobile Bravada was stopped. At the time of the stop, defendant removed a weapon, which belonged to him, from his waistband and placed it into Rosas's purse. Defendant was the registered occupant of room 258 at the Red Roof Inn on Anthony Drive in Champaign, Illinois, and currently possessed approximately half an ounce of crack cocaine there in a black leather duffel bag. Defendant had been using the room for one to two weeks to package cocaine he later distributed. Defendant was selling approximately four ounces of cocaine per day.

¶ 21    According to Officer Thompson, she transported Rosas to the Schnuck's grocery store parking lot in Savoy, Illinois. While there, Rosas swore to her affidavit in front of a judge.

The judge issued the warrant. Officer Thompson transported Rosas back to the Champaign County jail where she was booked for the possession of the drugs concealed within her vagina.

¶ 22 Armed with a search warrant, the officers searched the hotel room. During the course of the search, several items of evidentiary value were seized. Officers seized a silver Compaq laptop computer, its charging chord, and a speaker system, which were all located on a nightstand next to the bed; a certificate of title for a 1997 Oldsmobile Bravada issued to defendant, found in a duffel bag later determined to belong to defendant; a rental receipt from the Red Roof Inn naming defendant as the sole person who rented the room, which was found on the nightstand; a blank check belonging to defendant, found in the same duffel bag as the certificate of title; an Illinois identification (ID) card issued to defendant, which was found in a pair of men's jeans lying on the floor underneath the sink; and a prescription bottle containing pseudoephedrine for defendant, which was found on the counter next to the sink.

¶ 23 The officers also seized a velvet Crown Royal bag containing five live rounds of .25-caliber ammunition, which was found in a dresser drawer (at trial, Rosas testified the drawer also contained defendant's clothing, but defendant denied the items were his and testified they belonged to Rosas); a black digital scale, which was located under the Crown Royal bag; a box of plastic sandwich Baggies, which was found on top the microwave; numerous empty plastic Baggies with both bottom corners removed, which were found in the garbage can near the bathroom; 17 individual "corner Baggies" containing crack cocaine, all of which were found in a wadded-up paper towel in the garbage can; and two glass crack pipes and one metal crack pipe.

¶ 24 D. Defendant's Motion To Suppress Under *Franks v. Delaware*

¶ 25 On November 14, 2011, defendant filed a motion to suppress evidence under

*Franks v. Delaware*, 438 U.S. 154 (1978), seeking to exclude from evidence the items seized from the hotel room.   In support of his motion, defendant attached three affidavits—his own, one drafted by Cora Holland, and one purportedly drafted and signed by Rosas.   The first part of Rosas's affidavit to support defendant's motion to suppress contained argumentative statements about the lawfulness of the search itself.   Rosas's affidavit goes on to state she felt coerced to answer the police's questions at the scene of the traffic stop.   The affidavit states she was coerced into implicating defendant for possession of the weapon and the drugs in the hotel room.

¶ 26         Rosas's affidavit stated defendant was not in possession of the weapon at any time and it did not belong to him.   Defendant was not aware Rosas had the weapon in her purse. Defendant was not in possession of any drugs and was unaware Rosas had drugs on her or in the hotel room.   While some of defendant's possessions were in the hotel room, he would only come by occasionally to shower and change clothes.   Defendant rented the room at the hotel because Rosas did not have a State ID card.

¶ 27         Rosas's affidavit further stated Rosas had been addicted to crack cocaine for 11 years.   She supported her drug habit by "dating" men she did not know.   One man she "dated" came to the hotel room and inadvertently left the weapon found in Rosas's purse in the room. Rosas kept the weapon because she wanted to trade it for drugs.   Defendant always tried to help Rosas "leave the drug addiction and the drugs dating behind [her]."

¶ 28         Rosas's affidavit also stated everything Rosas told the police about defendant's drug-dealing operation was not true and she was solely responsible for the drugs and weapon recovered on March 18, 2011.   The last two sentences of Rosas's affidavit state, "The record reported that I was transported to [Schnuck's in Savoy, Illinois], before a judge to swear to a search

warrant to search the hotel room. I was never transported to [S]chnuck's in Savoy, [Illinois], before a judge nor did I ever swear to a search warrant before a judge."

¶ 29 The trial court denied defendant's motion to suppress.

¶ 30 E. Defendant's Trial

¶ 31 During the May 2012 jury trial, several people testified to the evidentiary significance of the items seized from defendant's vehicle and the hotel room. Officer Christian testified that in his experience as a police officer, he has encountered velvet Crown Royal bags approximately 50 times. He testified most times he has encountered these bags, they contain narcotics or a weapon. The .25-caliber ammunition located inside the Crown Royal bag was significant to Officer Christian because a .25-caliber handgun was recovered during the traffic stop. Officer Christian also testified regarding the digital scale found in the hotel room. He testified he had encountered such scales "hundreds, upon hundreds" of times throughout his experience as a police officer. Officer Christian testified the price of narcotics is generally determined by its weight. Narcotics dealers use digital scales to ensure they are giving their customers the correct quantity of narcotics. Narcotics users may also possess scales to make sure they are not "shorted" when they buy drugs.

¶ 32 Sergeant Dennis Baltzell of the Champaign police department testified to the significance of the plastic Baggies, of which the corners were removed. The Baggies were indicative of bags that have been used to package controlled substances, because the corners of the Baggies were missing. Based on his training and experience, Sergeant Baltzell would expect this type of Baggie to be found in locations where drugs were being packaged for sale. He would not expect to find this type of Baggie in a location where controlled substances were merely being

consumed or used.

¶ 33        Sergeant Baltzell also recovered the crack cocaine from the hotel room's trash can. He testified that based on his training and experience, he concluded the crack cocaine was packaged for sale—he found 17 individually wrapped packages, all containing similar amounts of crack cocaine.   Baltzell opined the 17 packages had a street value of $340.   Further, if Sergeant Baltzell were to find individually packaged amounts of a controlled substance, an electronic scale, additional whole plastic bags, and bags that had been cut off at the corners all at one location, he would conclude, based on his training and experience, the person in control of the location was engaged in the manufacture and delivery of a controlled substance.   Narcotics dealers often protect themselves with a firearm.   When drug dealers travel in a vehicle, they often conceal the narcotics within the vehicle and carry a firearm for protection.   Narcotics dealers commonly ask someone else to hold their drugs while transporting them in a vehicle.   Sergeant Baltzell opined the quantity of crack cocaine recovered from the trash can was not an amount consistent with personal use.

¶ 34        John Carnes, a forensic scientist for the Illinois State Police crime lab, testified he examined both the handgun and its magazine for latent prints of which he could make a comparison.   Carnes was unable to find any latent prints on the handgun or magazine capable of comparison.   Carnes testified it was possible to touch something and not leave behind fingerprints.   Further, fingerprint residue is very fragile and not easy to preserve.   Carnes was not given any item to examine for latent prints beside the gun and its magazine.

¶ 35        Cory Formea, a forensic scientist for the Illinois State Police crime lab, testified he collected a swab from each side of the gun's handle for deoxyribonucleic acid (DNA) analysis and

placed the swabs in the evidence vault, per department policy. Aaron Small, a forensic scientist with the Illinois State Police crime lab, performed the actual DNA analysis. He compared the swabs taken from the handgun with a standard sample from defendant. Small testified he obtained single-source DNA profiles from each of the swabs taken from the handgun. Those DNA profiles matched defendant's DNA profile. In fact, the matching DNA profile taken from the gun and defendant would be expected to occur in 1 in 130 quintillion African Americans, 1 in 5.8 sextillion Caucasians, and 1 in 45 sextillion southwest Hispanic unrelated individuals. (Defendant is African American.) It is possible to touch something and not leave behind DNA. No sample from Rosas was compared with the swabs from the gun.

¶ 36 John Martin, a forensic scientist at the Illinois State Police crime lab, testified the 17 individual packages recovered from the hotel room all contained a substance testing positive for cocaine. He determined the aggregate weight of the substance contained within the 17 bags was 4.6 grams. As for the package recovered from the toilet at the Champaign police department, it contained a substance testing positive for cocaine. Martin determined the aggregate weight of the substance recovered from the police department's toilet was 2.6 grams.

¶ 37 The State also presented the testimony of Rosas. She testified she was 27 years old and had been smoking crack cocaine for about 17 years. Rosas had problems with the law over the past three years, including two misdemeanor convictions and three pending felony charges. The pending felony charges involved both possession and delivery of a controlled substance. Rosas had known defendant for about four years, and they had been in a dating relationship for the past two years. Defendant and Rosas had been sharing the room at the hotel for about two weeks at the time of their arrest, but defendant spent the night in the hotel room only

some of those nights. Defendant kept a couple changes of clothes, various personal items, and a laptop computer in the room. Defendant also kept his crack cocaine in the room.

¶ 38    The night before Rosas and defendant were arrested, Rosas observed a man, nicknamed "Rabbit," enter the room and leave a large ball of cocaine for defendant. Rabbit and defendant did not exchange any words. Rosas then observed defendant break down the cocaine using a safety pin and package it for sale using the scale and plastic Baggies recovered from the room.

¶ 39    Once the crack cocaine was packaged for sale, defendant held onto the packages until somebody called to set up a deal. Defendant's customers would call defendant's cellular phone. Rosas answered the phone for defendant, took his customers' orders, and arranged a place to meet. Rosas would relay this information to defendant, and he would give her the appropriate amount of crack cocaine. Rosas would deliver the crack cocaine for defendant, either by bicycle or one of her friends' vehicles, and return the money to defendant. Rosas helped defendant deal drugs because she "was an addict, and you know, if I done something for him, you know, I would get me some dope, myself."

¶ 40    Rosas testified defendant obtained the handgun from a person in Rantoul. He traded a couple of bags of crack cocaine for the weapon. Defendant then asked Rosas to hold onto the gun for him because he was on probation and forbidden from possessing a weapon. Rosas was scared to hold onto the gun because she had never been in that much trouble. Defendant put the gun in her purse when they left the hotel on March 18, 2011. Rosas touched the gun only once when asked by defendant to wipe off his fingerprints, but Rosas did not do so. Rosas also testified as to how the crack cocaine came to be concealed within her vagina. She testified just before

- 12 -

Officer McDonald initiated the traffic stop, defendant handed her the cocaine and told her to hide it inside her body, which she understood to mean inside her vagina. Rosas complied with defendant's request.

¶ 41 On cross-examination, Rosas admitted she was hoping to receive leniency from the State's Attorney in her pending cases by testifying against defendant here. Rosas also admitted she smoked at least nine $20 pieces of crack cocaine per day. When showed a picture of the dresser drawer containing the scale and Crown Royal bag, Rosas denied the items were hers. "Rabbit" sold crack cocaine to Rosas on occasion but not while she was living at the hotel. She stated she and defendant both stayed in the hotel room and defendant paid for the room.

¶ 42 Defense counsel then confronted Rosas with the numerous inconsistent statements she had given throughout the pendency of this case. Rosas admitted she first told Officer Sumption nothing illegal was contained within the car before she told him a gun was in her purse. While sitting in the back of the squad car, Rosas told the officers approximately one-half ounce of crack cocaine was in a black duffel bag in the hotel room. Defense counsel also confronted Rosas with the inconsistency in her story of the transaction by which defendant came into possession of the handgun.

¶ 43 Defense counsel confronted Rosas with her conflicting statements regarding how the handgun got into her purse—she first told police defendant carried her purse containing the weapon to the vehicle but later told police defendant placed the handgun in her purse just before Officer McDonald initiated the traffic stop. Defense counsel also confronted Rosas about the crack cocaine found concealed in her vagina. When her postarrest interview began, Rosas denied having anything illegal on her person, but during the course of the interview, a bag containing

individually wrapped pieces of cocaine was recovered from the toilet after Rosas had used it. Rosas told police defendant physically placed the crack cocaine inside her body, but she later told them defendant handed her the drugs and told her to conceal them inside her vagina.

¶ 44        Rosas also admitted she told Officer McDonald she would cooperate as long as she did not go to jail.   Defense counsel then confronted Rosas with her affidavit in support of defendant's *Franks* motion to suppress.   Rosas admitted she signed the document before the January 2012 hearing on defendant's *Franks* motion.   Rosas also admitted she testified she signed the document in front of a notary.   When asked whether she wrote the document, Rosas testified she "helped writing that document."   Rosas then testified she was told to write the portions incriminating herself and exonerating defendant, but she did not identify who told her to do so.

¶ 45        On redirect examination, the State asked Rosas about the affidavit in support of defendant's *Franks* motion.   Rosas testified defendant told her to write the affidavit and to include the information exonerating defendant.   The State inquired about Rosas's statement in the affidavit in which she stated she was never taken to Savoy, Illinois, to swear to an affidavit before a judge.   Rosas testified she included this statement, even though she knew it could be proved false, because she was scared of defendant.   She knew if she did not take the blame, defendant would punch and slap her.   Defendant took Rosas to the notary and stood by as the document was notarized.

¶ 46        Defendant testified on his own behalf.   He was renting the hotel room for Rosas as a favor to her.   Defendant kept clothing and some toiletries at the hotel room because he would stay the night in the room on occasion.   Defendant did not keep anything in the drawers. According to defendant, "[e]verything in that room basically belongs to Ms. Rosas, because the

room was for her, because I had my own place."

¶ 47    Defendant knew Rosas had a handgun, "[b]ecause she dated a man once who's named Jimmy, that's what she told me, and he was the one that had had the weapon."   Defendant saw the handgun in Rosas's possession three days before the traffic stop and asked Rosas to dispose of it.   Rosas kept the gun because she knew she could trade it for drugs.   Defendant touched the gun, only once, because he thought it was a "nice weapon."

¶ 48    Defendant denied attempting to start his vehicle after Officer McDonald asked him to exit the car.   Defendant denied he ever handled the handgun aside from when he first discovered it was in Rosas's possession.   Rosas carried the handgun to his vehicle of her own free will.   Defendant denied packaging and selling drugs from the hotel.   Defendant denied ever selling drugs—he was previously a drug user, not a dealer.   Rosas did not deliver drugs for defendant.   Defendant did not know drugs were in the hotel room.   He knew, however, Rosas supported her drug habit through prostitution, and he had been present when Rosas brought men to the room.

¶ 49    Defendant denied ever possessing the crack cocaine in Rosas's vagina.   He did not tell Rosas to hide the crack cocaine inside her vagina.   Rosas fabricated her statements incriminating defendant because she wanted leniency from the State.   Defendant denied telling Rosas what information to include in her affidavit in support of his *Franks* motion.   Defendant never told Rosas how to testify in another proceeding and never threatened her harm.

¶ 50    On cross-examination, defendant maintained he was helping Rosas rent the hotel room out of the goodness of his heart.   He would take cash she gave him to go pay for the room. He sometimes paid a portion of the bill out of his own pocket.   Sometimes, defendant "dated"

Rosas and gave her money in exchange.   Defendant knew Rosas was a drug user on March 18, 2011, but he "never got involved" with what she did.   He often told her to go to rehab, but she was stubborn and would not listen.   "She kept her lifestyle," defendant testified, "and my mistake was just being around her like that."

¶ 51     Defendant stated he had not smoked crack cocaine in four to five years.   At the time of trial, defendant still associated with Rosas.   When asked whether his relationship with Rosas was the same as it was on March 18, 2011, defendant stated it was.   The last time defendant "dated" Rosas was about three months prior to trial.   Defendant thought he and Rosas would still be on good terms after her testimony at trial.   Rosas was only incriminating him to get leniency from the State.   Defendant was not upset with Rosas's testimony at trial because he knew she would testify as she did all along.   Defendant knew he was the person the police were really after. Defendant was never guilty of any offense of which he was accused.   This incident, like all his other previous run-ins with the law, was caused by the fact he is a nice person and others take advantage of him.

¶ 52     On this evidence, the jury found defendant guilty on both counts.

¶ 53                    F. Defendant's Sentence

¶ 54     On July 2, 2012, the cause proceeded to defendant's sentencing hearing.   Prior to the hearing, the parties were allowed to suggest corrections to the presentence investigation report (PSI).   Only the State took this opportunity, adding dates and case numbers to the portion of the PSI detailing defendant's criminal history.   After the parties presented evidence in aggravation and mitigation and argued the appropriate sentence for this case, defendant addressed the court. Defendant stated he was innocent of the charges in this case.   In fact, he was not guilty of any

offense in his criminal history. On this occasion and in his past, defendant was guilty only by his association with criminals.

¶ 55    The trial court sentenced defendant to a 30-year term on count I and a concurrent 10-year term on count II. After announcing this sentence, the court addressed the issues of sentencing credit and monetary assessments with the parties. The court asked defense counsel whether 145 days was the correct calculation of credit for time served, and counsel responded in the affirmative. Thereafter, the court awarded defendant 145 days' credit for time served and ordered defendant to pay a $100 crime laboratory analysis fee, a $2,000 mandatory assessment, and a $340 street-value fine for the cocaine recovered from the hotel room. In addition, the court authorized a $250 DNA analysis fee to be imposed, but only if defendant had not previously been assessed the fee. Finally, the court ordered defendant to "pay all fines, fees, and costs as authorized by statute," but it did not specifically refer to any fine, fee, or cost other than those already stated. The court asked whether the parties had anything else to add, and both parties responded they did not.

¶ 56    After defendant's sentencing hearing, the circuit clerk calculated the statutorily authorized assessments against defendant, which are reflected in a printout from the clerk. The printout from the clerk (see appendix), shows defendant was assessed the following fines and fees on count I: (1) a $5 document-storage assessment; (2) a $10 automation assessment; (3) a $100 circuit-clerk assessment; (4) a $25 court-security assessment; (5) a $50 court-finance assessment; (6) a $40 State's Attorney assessment (a $30 assessment for felony conviction plus the $10 remitted to the State's Attorney as part of the juvenile expungement assessment); (7) a $2 "State's Attorney Au" assessment; (8) a $10 arrestee's medical assessment; (9) a $5 spinal-cord-research

assessment; (10) a $250 "State Offender DN" assessment; (11) a $100 trauma-fund assessment; (12) a $590 traffic/criminal surcharge; (13) a $30 juvenile expungement assessment listed as three separate $10 assessments for the State Police Services Fund, State's Attorney's Office Fund (the $10 assessment for the State's Attorney is included in the $40 charge listed for the State's Attorney on the clerk's printout), and Circuit Clerk Operations and Administrative Fund; (14) a $5 drug-court assessment; (15) a $236 violent crimes victims assistance (VCVA) assessment; (16) a $340 street-value fine; (17) a $1,275 mandatory assessment; and (18) a $10 State Police operations assessment.

¶ 57        On count II, the circuit clerk's printout shows defendant was assessed the following fines and fees: (1) a $5 document-storage assessment; (2) a $10 automation assessment; (3) a $100 circuit-clerk assessment; (4) a $25 court-security assessment; (5) a $50 court-finance assessment; (6) a $40 State's Attorney assessment (a $30 assessment for felony conviction plus the $10 remitted to the State's Attorney as part of the juvenile expungement assessment); (7) a $2 "State's Attorney Au" assessment; (8) a $10 arrestee's medical assessment; (9) a $10 traffic/criminal surcharge; (10) a $30 juvenile expungement assessment listed as three separate $10 assessments for the State Police Services Fund, State's Attorney's Office Fund (the $10 assessment for the State's Attorney is included in the $40 charge listed for the State's Attorney on the clerk's printout), and Circuit Clerk Operations and Administrative Fund; (11) a $5 drug-court assessment; (12) a $4 VCVA assessment (we note the printout also contains an entry called "VICTIMS FUND—NO FI," with no dollar amount listed); and (13) a $10 State Police operations assessment.   The printout also contains an entry for "CRIME LAB," but no dollar amount is listed.

¶ 58        This appeal followed.

¶ 59                                     II. ANALYSIS

¶ 60                          A. Sufficiency of the Evidence

¶ 61         Defendant argues the State failed to produce sufficient evidence to sustain his conviction for unlawful possession with intent to deliver a controlled substance.   Specifically, defendant argues the State's case was based entirely on the incredible testimony of Kimberly Rosas, and as a result, defendant's conviction and sentence for that offense must be vacated.   The State responds the evidence, notwithstanding Rosas's testimony, is sufficient to sustain his conviction.   Defendant does not challenge his conviction for unlawful possession of a weapon by a felon.

¶ 62         When met with a challenge to the sufficiency of the evidence, this court, viewing the evidence in the light most favorable to the State, considers whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.   *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007).   The critical question is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.   *Id.* "This standard of review applies, 'regardless of whether the evidence is direct or circumstantial [citation], and regardless of whether the defendant receives a bench or jury trial [citation].' "   *Id.* (quoting *People v. Cooper*, 194 Ill. 2d 419, 431, 743 N.E.2d 32, 40 (2000)).

¶ 63         It is not this court's function to retry defendant when met with challenges to the sufficiency of the evidence.   *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999).   Instead, our duty is "to carefully examine the evidence while giving due consideration to the fact that the [trial] court and jury saw and heard the witnesses."   *Id.*   As such, the jury's findings regarding witness credibility are entitled to great weight.   *Wheeler*, 226 Ill. 2d at 115, 871 N.E.2d

- 19 -

at 740.  The jury's findings regarding witness credibility are neither conclusive nor binding, however, because reasonable people may act unreasonably on occasion.  *Id*.  "Accordingly, a conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt."  *Id*.

¶ 64         To sustain a conviction for unlawful possession with intent to deliver a controlled substance, the State must prove beyond a reasonable doubt (1) the defendant had knowledge of the presence of the controlled substance; (2) the controlled substance was in the immediate possession or control of the defendant; and (3) the defendant intended to deliver the controlled substance.  *People v. Robinson*, 167 Ill. 2d 397, 407, 657 N.E.2d 1020, 1026 (1995).

¶ 65         Knowledge can rarely be proved by direct evidence and is typically "proved by defendant's actions, declarations, or conduct from which an inference of knowledge may be fairly drawn."  *People v. Roberts*, 263 Ill. App. 3d 348, 352, 636 N.E.2d 86, 90 (1994).   Because knowledge is difficult to prove, when actual or constructive possession is established, knowledge can generally be inferred from the surrounding circumstances.  *Id*. at 352-53, N.E. 2d 86, 90; see also *People v. Nettles*, 23 Ill. 2d 306, 308, 178 N.E.2d 361, 363 (1961) ("where narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics").   Actual possession requires actual physical dominion over the contraband, while constructive possession is established where a defendant has exclusive control of the premises in which the contraband is found.  *Roberts*, 263 Ill. App. 3d at 352-53, 636 N.E.2d at 90.   "The requirement of exclusive control does not mean that possession may not be joint."  *Id*. at 353, 636 N.E.2d at 90.

¶ 66         Intent is also rarely proved by direct evidence.  *Robinson*, 167 Ill. 2d at 408, 657

N.E.2d at 1026.   Courts look to a variety of factors to prove the intent element of the instant

offense, which include:

> "whether the quantity of controlled substance in defendant's
>
> possession is too large to be viewed as being for personal
>
> consumption [citation], the high purity of the drug confiscated
>
> [citation], the possession of weapons [citation], the possession of
>
> large amounts of cash [citation], the possession of police scanners,
>
> beepers or cellular telephones [citations], the possession of drug
>
> paraphernalia [citation] and the manner in which the substance is
>
> packaged [citation]."   *Id.*, 657 N.E.2d at 1026-27.

In *People v. Beverly*, 278 Ill. App. 3d 794, 663 N.E.2d 1061 (1996), this court affirmed a

defendant's conviction for unlawful possession with the intent to deliver a controlled substance

where the drugs were packaged for sale and the State proved one additional factor tending to show

an intent to deliver—the presence of a large amount of cash on defendant's person.   *Id.* at 802, 663

N.E.2d at 1066-67; see also *People v. Delgado*, 256 Ill. App. 3d 119, 123, 628 N.E.2d 727, 730

(1993) ("The minimum this court has required for the affirmance of a conviction for delivery

involving small amounts of drugs is possession of the controlled substance packaged for sale, plus

at least one additional factor indicative of delivery ***.").

¶ 67          In this case, the record evidence reasonably supports a finding of guilt.   Defendant

had exclusive control over the hotel room in which the 4.6 grams of cocaine were found.   In this

case, defendant was the only person named in the hotel rental agreement and paid for the room in

cash each day.   Defendant kept important personal belongings in the room, such as a blank check,

a laptop computer, the certificate of title to his vehicle, and prescription medication.  Defendant also kept clothes and toiletries in the hotel room.  Just because Rosas also had unfettered access to the room and stayed there more often than defendant does not mean defendant did not have exclusive control over the premises.  See *People v. Songer*, 229 Ill. App. 3d 901, 905, 594 N.E.2d 405, 408 (1992).  Exclusive possession may be joint.  *People v. Burke*, 136 Ill. App. 3d 593, 599, 483 N.E.2d 674, 679 (1985).  Because defendant had exclusive control over the hotel room in which the crack cocaine was found, he constructively possessed the crack cocaine recovered therefrom.

¶ 68        Since defendant had constructive possession of the crack cocaine found in the trash can of the hotel room, the jury was entitled to find defendant had the requisite knowledge crack cocaine was present in the room.  See *Nettles*, 23 Ill. 2d at 308, 178 N.E.2d at 363.  Here, other facts tend to show defendant had knowledge of the presence of crack cocaine inside the hotel room.  Defendant was aware of the fact Rosas used cocaine.  Further, defendant knew Rosas "dated" men at the hotel to support her crack cocaine addiction.  Defendant had the requisite knowledge crack cocaine was located inside the hotel room.

¶ 69        Based on the record, we also conclude the jury was justified in finding defendant had the requisite intent to deliver the crack cocaine.  While executing the search warrant for the hotel room, the police recovered a digital scale, live .25-caliber ammunition, whole plastic Baggies, plastic Baggies of which the bottom corners had been removed, and 17 individually wrapped pieces of crack cocaine.  Because the crack cocaine found in the hotel room was packaged in a manner consistent with how it is sold, the presence of one additional factor tending to show intent can support a finding of intent to deliver a controlled substance.  See *Beverly*, 278

Ill. App. 3d at 802, 663 N.E.2d at 1066-67. Here, not only was the crack cocaine packaged for sale, but ammunition and paraphernalia consistent with drug dealing were also found in the hotel room. Further, the police recovered a gun during the search of defendant's vehicle. The jury was entitled to find defendant had the requisite intent to deliver the 4.6 grams of cocaine in the hotel room.

¶ 70 Turning to the 2.6 grams of crack cocaine recovered from the toilet at the Champaign police department, the record evidence supports a finding of guilt. Defendant had constructive possession over the crack cocaine hidden inside Rosas's body as he had exclusive control over the vehicle in which Rosas was traveling. Defendant was the sole person listed on the vehicle's certificate of title. While the crack cocaine was located in Rosas's body, giving her actual possession thereof, the jury was entitled to find defendant constructively possessed the cocaine. See *People v. Schmalz*, 194 Ill. 2d 75, 82, 740 N.E.2d 775, 779 (2000) ("The rule that possession must be exclusive does not mean that the possession may not be joint ***.").

¶ 71 Defendant's constructive possession of the crack cocaine ultimately recovered from the Champaign police department toilet gives rise to an inference defendant had knowledge of the presence of the crack cocaine. See *Nettles*, 23 Ill. 2d at 308, 178 N.E.2d at 363. Further, testimony of defendant's attempt to lock the door and start the vehicle supports the inference defendant had the requisite knowledge.

¶ 72 Finally, the record evidence shows the jury was entitled to find defendant had the requisite intent to deliver a controlled substance. The crack cocaine ultimately recovered from the Champaign police department toilet was packaged for sale in the same manner as that recovered from the hotel room. Further, a loaded handgun was recovered from Rosas's purse

during the traffic stop.

¶ 73    Defendant asserts the State's evidence against him "was based entirely on the testimony of admitted addict and co-defendant Kimberly Rosas."  Defendant argues Rosas's testimony does not carry the absolute conviction of its truth and, therefore, does not suffice as proof beyond a reasonable doubt of his guilt.  In support of his argument, defendant cites *Smith*, 185 Ill. 2d 532, 708 N.E.2d 365.  In *Smith*, defendant challenged the sufficiency of the evidence on his murder conviction.  *Id*. at 534, 708 N.E.2d at 366.  The supreme court determined the "weakness of the State's chief witness, along with the lack of other direct evidence linking defendant to the crime, required a not guilty verdict as a matter of law."  *Id*. at 542, 708 N.E.2d at 370.  The supreme court noted "the circumstantial evidence tending to link defendant to the murder merely narrowed the class of individuals who may have killed the victim, without pointing specifically to defendant."  *Id*. at 545, 708 N.E.2d at 371.

¶ 74    The record shows Rosas's statements throughout the pendency of this case contained numerous inconsistencies as to how she came into possession of the gun and the drugs ultimately recovered from her vagina.  Her two affidavits appear to be in direct conflict with one another.  Rosas is admittedly addicted to crack cocaine and hoped for leniency from the State in exchange for her statements incriminating defendant.  Rosas's statements are subject to question, and they were subjected to scrutiny by the attorneys in this case.  Further, Rosas testified she was charged as defendant's codefendant with possession of the crack cocaine hidden in her vagina. On the State's request, the jury was instructed to view Rosas's testimony with caution.  See Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (prior inconsistent statements); Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (accomplice testimony).  The trier of

fact was entitled to decide which version of events she gave should be credited.

¶ 75     Moreover, we disagree the State's case was based entirely on Rosas's statements and testimony.   The State presented much circumstantial evidence against defendant notwithstanding Rosas's statements and testimony.   Defendant rented a hotel room in which extensive evidence of a drug-dealing operation was found.   The State presented the testimony of 11 people in addition to Rosas.   Officer Christian and Sergeant Baltzell explained to the jury the evidentiary significance of the items found in the hotel room—the items found were indicative of the manufacture and delivery of a controlled substance.   The jury was present throughout the proceedings and found the State's witnesses more credible than the defendant's own self-serving statements of innocence.   The evidence presented by the State reasonably supports a finding of guilt, and our function is not to reweigh this evidence.   We affirm defendant's conviction for unlawful possession with intent to deliver a controlled substance.

¶ 76                               B. Fines and Fees

¶ 77     Defendant contends the trial court improperly duplicated the assessments imposed pursuant to his conviction.   Specifically, defendant argues he was assessed the statutorily authorized fines and fees on each count within his single case, which is improper under *People v. Alghadi*, 2011 IL App (4th) 100012, 960 N.E.2d 612.   Defendant argues this court should vacate the duplicate fines.   In addition, defendant argues the circuit clerk improperly assessed a $250 DNA analysis fee after the court conditionally ordered the fee at his sentencing hearing.

¶ 78     The State concedes defendant was improperly assessed duplicate fines and fees and the DNA analysis fee.   The State, further, disagrees the trial court imposed certain fines, instead arguing because the circuit clerk improperly imposed these assessments; remand is required so the

fines may be imposed by the judge. In addition, the State contends the court, on remand, must increase the street-value fine imposed pursuant to defendant's conviction on count I because the court erroneously imposed the fine on only the cocaine found in the hotel room.

¶ 79    We previously rejected the State's concession as to the duplicate fines and fees (see *Beacham v. Walker*, 231 Ill. 2d 51, 60-61, 896 N.E.2d 327, 333 (2008)) and concluded the circuit clerk improperly imposed certain fines, the trial court failed to impose certain mandatory fines, and the trial court improperly calculated certain fines. *Warren*, 2014 IL App (4th) 120721, ¶¶ 76-157, 16 N.E.3d 13. We vacated those fines improperly imposed and remanded for the trial court to reimpose the mandatory fines vacated and impose all other fines mandated by statute, which required certain fines previously imposed be recalculated. *Id*. We are now charged with reconsidering our conclusions in light of the supreme court's decision in *Castleberry*. *Warren*, No. 118322 (Ill. Jan. 20, 2016) (nonprecedential supervisory order).

¶ 80                                  1. *Castleberry*

¶ 81    In *Castleberry*, the defendant was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(8) (West 2008)), and the trial court imposed a 15-year sentencing enhancement to one of the counts. *Castleberry*, 2015 IL 116916, ¶¶ 3-4, 43 N.E.3d 932. The defendant appealed, asserting, in relevant part, the 15-year enhancement was unconstitutional. *Id*. ¶ 5. The appellate court affirmed, concluding the trial court did not err in applying the sentencing enhancement. *Id*. However, the court, in responding to an argument raised by the State, also held defendant's sentence was void as it did not conform to the mandatory statutory requirement that a sentencing enhancement be added to each count on which the defendant had been convicted, and it remanded the matter to the trial court for

- 26 -

resencing.  *Id.* ¶ 6.  The defendant filed a petition for leave to appeal in the Supreme Court of Illinois, which was granted.  *Id.* ¶ 7.

¶ 82          The principal issue before the supreme court was "whether the 'void sentence rule,' which states that '[a] sentence which does not conform to a statutory requirement is void' (*People v. Arna*, 168 Ill. 2d 107, 113, [658 N.E.2d 445[, 448]] (1995)), should be abandoned."  *Id.* ¶ 1. The court observed the void sentence rule developed from prior cases holding, in addition to subject-matter and personal jurisdiction, trial courts also possess " 'inherent authority' " or " 'inherent power.' " *Id.* ¶ 13. Specifically, the court noted:

> "[O]ur cases have at times also held 'that the power to render the
> particular judgment or sentence is as important an element of
> jurisdiction as is personal jurisdiction and subject matter
> jurisdiction.'  [Citation.]   Based on this idea, the rule has
> developed which holds that a circuit court which violates a
> particular statutory requirement when imposing a sentence acts
> without 'inherent authority' or 'inherent power.'   And, because the
> court has acted without power, it has acted without jurisdiction,
> thereby rendering the sentence void.   Thus, the void sentence rule
> is stated:   'A sentence which does not conform to a statutory
> requirement is void.'   [Citation.]"  *Id.*

The court observed, however, the Illinois Constitution granted trial courts original jurisdiction over " 'all justiciable matters.' "  *Id.* ¶ 18. The supreme court found, " 'while the legislature can create new justiciable matters by enacting legislation that creates rights and duties, the failure to

- 27 -

comply with a statutory requirement or prerequisite does not negate the [trial] court's subject matter jurisdiction or constitute a nonwaivable condition precedent to the [trial] court's jurisdiction.' " *Id*. ¶ 15. Rather, it held, only fundamental defects, such as lack of personal or subject-matter jurisdiction, warrant a judgment to be declared void. *Id*. ¶¶ 15-18. As the basis of the void sentence rule was constitutionally unsound, the court abolished the rule. *Id*.

¶ 83        Setting aside the void sentence rule, the supreme court found Illinois Supreme Court Rule 604(a) (eff. July 1, 2006) and Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967) did not vest the appellate court with the authority to increase a defendant's sentence at the request of the State. *Castleberry*, 2015 IL 116916, ¶¶ 20-24, 43 N.E.3d 932. The court found Rule 604(a), which provides specific situations where the State may appeal in a criminal case, did not allow the State to appeal or cross-appeal a sentencing order. *Id*.; Ill. S. Ct. R. 604(a) (eff. July 1, 2006). The court rejected the State's contention the appellate court could address its argument as it was simply responding to a claim raised by defendant attacking his sentence as unauthorized. *Castleberry*, 2015 IL 116916, ¶ 22, 43 N.E.3d 932. The court noted, while the State is free to raise any argument of record in support of the trial court's judgment, it cannot attack the sentencing order in any way with a view toward enlarging its own rights or lessening the rights of its adversary. *Id*. The court further found Rule 615(b)(1), which provides appellate courts with the authority to "reverse, affirm, or modify the judgment or order from which the appeal is taken," (Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967) did not serve as a means by which the appellate court could increase a defendant's sentence but rather is limited to reducing the punishment imposed by the trial court. *Castleberry*, 2015 IL 116916, ¶ 24, 43 N.E.3d 932. The court concluded, "[a]lthough the appellate court may not, under our rules, address a request by the State to increase a criminal

- 28 -

sentence which is illegally low, the State may, in appropriate circumstances, seek relief from this court via the writ of *mandamus*." *Id*. ¶ 26.

¶ 84    With the findings of *Castleberry* in mind, we turn to our previous conclusions regarding the fines and fees imposed against defendant and our directions to the trial court on remand.

¶ 85    2. *Fines and Fees on Each Count: Rethinking Alghadi*

¶ 86    Defendant takes issue with the trial court's imposition of one of each of the following assessments on each count in his case: (1) a $5 document-storage assessment; (2) a $10 automation assessment; (3) a $100 circuit-clerk assessment; (4) a $25 court-security assessment; (5) a $10 arrestee's medical assessment; (6) a $50 court-finance assessment; (7) a $40 State's Attorney assessment; (8) a VCVA assessment ($236 on count I and $4 on count II); and (9) a $10 State Police operations assessment.   Defendant contends the court could not properly impose these duplicate assessments on each count within his case, citing *Alghadi*, 2011 IL App (4th) 100012, 960 N.E.2d 612.

¶ 87    a. Trial Court Must Impose Fines as Component of Sentence

¶ 88    We must first consider whether the trial court or the circuit clerk imposed the assessments in this case.   Defendant argues the *trial court* improperly imposed the duplicate assessments of which he takes issue.   The State, however, points out the *circuit clerk* imposed the assessments.   See *People v. Chester*, 2014 IL App (4th) 120564, ¶ 35, 5 N.E.3d 227 ("In appeals raising statutory credit issues, this requires the parties' briefs to contain a statement of facts identifying which specific fines the trial court identified and expressly imposed as part of the sentence—and which fines the circuit clerk simply assessed after sentencing and without bringing

- 29 -

them to the judge's attention and having the judge sign off on them in a supplemental sentencing judgment—and providing appropriate citations to the record.   The parties may not agree to overlook or otherwise ignore the circuit clerk's imposition of fines not ordered by the trial court."). The record shows the court, at defendant's July 2012 sentencing hearing, ordered defendant to "pay all fines, fees, and costs as authorized by statute."   The record contains no docket entry, order, or amended sentencing judgment reflecting the imposition of these assessments during sentencing. The record does not otherwise indicate the court approved these assessments, defendant or the attorneys were present for their imposition, or even that defendant or defense counsel were notified thereof.

¶ 89        In this case, when the trial court ordered defendant to "pay all fines, fees, and costs as authorized by statute," it improperly delegated its power to impose a sentence to the circuit clerk.   See *People v. Fontana*, 251 Ill. App. 3d 694, 709, 622 N.E.2d 893, 904 (1993) (Second District, "the imposition of a fine is a judicial act which can be performed only by a judge"); *People v. Rexroad*, 2013 IL App (4th) 110981, ¶ 52, 992 N.E.2d 3 ("The circuit clerk has no authority to impose fines."); *Chester*, 2014 IL App (4th) 120564, ¶¶ 29-38, 5 N.E.3d 227 (in finding the clerk improperly imposed the fines at issue, the court held the task of imposing fines may not be delegated to the clerk); *People v. Montag*, 2014 IL App (4th) 120993, ¶ 37, 5 N.E.3d 246 (vacating the circuit clerk's imposition of mandatory fines because the circuit clerk has no authority to levy fines against a criminal defendant); see also *People v. Isaacson*, 409 Ill. App. 3d 1079, 1085, 950 N.E.2d 1183, 1189-90 (2011) (trial court expressly imposed a DNA assessment and a contribution to the Crime Detection Network and ordered defendant to pay whatever mandatory assessments, including the VCVA fine, listed by the circuit clerk; the record contained

- 30 -

no evidence the court itself determined the mandatory fines that applied to the defendant's conviction and the appropriate amounts of those fines; this court held the conditional discharge order erroneously abdicated that task to the clerk).   The proposition the circuit clerk has no authority to impose fines stems from a long line of cases unaffected by the supreme court's decision in *Castleberry*.   Any *fine* imposed by the clerk must be vacated and the cause remanded for the trial judge to impose the fines.   *Montag*, 2014 IL App (4th) 120993, ¶ 37, 5 N.E.3d 246.

¶ 90                          b. Assessments Imposed by Circuit Clerk

¶ 91                          i. *Distinction Between Fines and Fees*

¶ 92          We next consider whether the assessments levied by the circuit clerk in this case are fines or fees, because any *fine* assessed by the clerk must be vacated.

¶ 93          The supreme court has recognized, despite their label as fees, certain assessments imposed pursuant to a conviction are fines.   *People v. Graves*, 235 Ill. 2d 244, 250, 919 N.E.2d 906, 909-10 (2009); *People v. Jones*, 223 Ill. 2d 569, 599-600, 861 N.E.2d 967, 985-86 (2006). The *Graves* court explained the distinction between fines and fees as follows:

> "A fee is defined as a charge that seeks to recoup expenses incurred
> by the state, or to compensate the state for some expenditure
> incurred in prosecuting the defendant.   [Citation.]   A fine,
> however, is punitive in nature and is a pecuniary punishment
> imposed as part of a sentence on a person convicted of a criminal
> offense. [Citation.]"   (Internal quotation marks omitted.)   *Graves*,
> 235 Ill. 2d at 250, 919 N.E.2d at 909.

¶ 94                          ii. *Can Fines and/or Fees Be Imposed on Each Count?*

¶ 95        As part of our analysis, we next consider whether the assessments levied in this case can properly be imposed on *each count* in a defendant's case.

¶ 96        This court has addressed the issue of whether certain fines, fees, and costs may be imposed on each count in a defendant's single case.   In *Alghadi*, 2011 IL App (4th) 100012, 960 N.E.2d 612, we explained, without the benefit of briefs or argument by the parties, as follows:

> "Although a defendant may be charged with multiple counts within the same case number, the defendant may only be assessed (1) *one* document-storage fee, (2) *one* automation fee, (3) *one* circuit-clerk fee, (4) *one* court-security fee, (5) *one* arrestee's-medical assessment, (6) *one* court-finance fee, (7) *one* State's Attorney assessment, (8) *one* VCVA fine, and (9) *one* drug-court fee." (Emphases in original.)   *Alghadi*, 2011 IL App (4th) 100012, ¶ 22, 960 N.E.2d 612.

¶ 97        Following this court's decision in *Alghadi*, the Second District addressed the issue of whether fines may be imposed on each count within a defendant's single case.   In *People v. Pohl*, 2012 IL App (2d) 100629, 969 N.E.2d 508, and *People v. Martino*, 2012 IL App (2d) 101244, 970 N.E.2d 1236, the Second District approached the issue by examining the language of the statute or ordinance imposing each fee to ascertain whether that fee could be imposed more than once.   While the instant appeal was pending, this court decided *People v. Larue*, 2014 IL App (4th) 120595.   In *Larue*, we declined to apply our own decision in *Alghadi*, and instead followed the Second District's approach to duplicate fines and fees.   *Id.* ¶ 59.   We will examine the statutory language authorizing or mandating each fine or fee to determine whether the

- 32 -

imposition of multiple fines or fees in a defendant's single case is proper.

¶ 98                                iii. *The Assessments in This Case*

¶ 99            To determine whether an assessment is a fine or a fee and whether the assessment may be imposed on each count within a defendant's case, we look to the language of the statutes providing for their imposition.   Because the issues presented are ones of statutory construction, our review is *de novo*.   *People v. Gutman*, 2011 IL 110338, ¶ 12, 959 N.E.2d 621.   Our primary objective when construing a statute is to ascertain and effectuate the legislature's intent.   *Id*.   The best indication of the legislature's intent is the language of the statute, which should be given its plain and ordinary meaning.   *People v. Giraud*, 2012 IL 113116, ¶ 6, 980 N.E.2d 1107.   "When statutory language is plain and unambiguous, the statute must be applied as written without resort to aids of statutory construction."   *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184, 902 N.E.2d 667, 671 (2009).

¶ 100                          (a) The Document-Storage Assessments:
                              A Fee Not Properly Imposed on Each Count

¶ 101            The record shows the circuit clerk imposed a $5 document-storage fee (705 ILCS 105/27.3c(a) (West 2010)) on each count in defendant's case.   In *Larue*, 2014 IL App (4th) 120595, ¶ 62, we held the clerk could only assess one document-storage fee against the defendant, even though his case resulted in multiple convictions.   We vacate one of the document-storage fees assessed against defendant in this case.

¶ 102                          (b) The Automation Assessments:
                              A Fee Not Properly Imposed on Each Count

¶ 103            The record shows the circuit clerk imposed a $10 automation fee (705 ILCS 105/27.3a (West 2010)) on each count in defendant's case.   In *Larue*, we held the clerk could

- 33 -

assess only one automation fee per case. *Larue*, 2014 IL App (4th) 120595, ¶ 64. We vacate one of the automation fees assessed against defendant in this case.

¶ 104 (c) The Circuit-Clerk Assessments:
A Fee Not Properly Imposed on Each Count

¶ 105 The record shows the circuit clerk imposed a $100 circuit-clerk fee (705 ILCS 105/27.1a(w) (West 2010)) on each count in defendant's case. In *Larue*, we held the clerk could assess only one circuit-clerk fee per felony complaint. *Larue*, 2014 IL App (4th) 120595, ¶ 66. Here, the two counts filed by the State constituted one felony complaint. We vacate one of the circuit-clerk fees assessed against defendant in this case.

¶ 106 (d) The Court-Security Assessments:
A Fee Not Properly Imposed on Each Count

¶ 107 The record shows the circuit clerk imposed a $25 court-security fee (55 ILCS 5/5-1103 (West 2010)) on each count in defendant's case. In *Larue*, we held the clerk could assess only one court-security fee against the defendant. *Larue*, 2014 IL App (4th) 120595, ¶ 68. We vacate one of the court-security fees assessed against defendant in this case.

¶ 108 (e) The Court-Finance Assessments:
A Fee Properly Imposed on Each Count

¶ 109 The record shows the circuit clerk imposed a $50 court-finance fee (55 ILCS 5/5-1101(c), (g) (West 2010)) on each count in defendant's case. In *Larue*, we held the clerk can properly impose a court-finance fee for each judgment of guilty or order of supervision. *Larue*, 2014 IL App (4th) 120595, ¶ 70. In this case, because defendant was found guilty of two offenses, the clerk properly assessed two court-finance fees against defendant.

¶ 110 (f) The State's Attorney Assessments:
A Fee Properly Imposed on Each Count

¶ 111　　　　The record shows the circuit clerk imposed a $40 State's Attorney fee (55 ILCS 5/4-2002 (West 2010)) on each count in defendant's case.　In *Larue*, we held the clerk could impose the State's Attorney assessment on a per-conviction basis.　*Larue*, 2014 IL App (4th) 120595, ¶ 72.　In this case, because defendant was convicted of two offenses, the circuit clerk properly assessed two State's Attorney fees against defendant.

¶ 112　　　　Our review of the statute authorizing the State's Attorney fee shows the State's Attorney is entitled to receive $30 for each felony conviction.　55 ILCS 5/4-2002(a) (West 2010). The additional $10 listed under the State's Attorney assessment on the circuit clerk's printout is the $10 sum paid to the State's Attorney out of the $30 juvenile-expungement assessment discussed below.　See 730 ILCS 5/5-9-1.17 (West 2010).

¶ 113　　　　　　　　(g) The State's Attorney Automation Assessments:
　　　　　　　　　　　A Fee Properly Imposed on Each Count

¶ 114　　　　The record shows the circuit clerk imposed a $2 State's Attorney automation fee on each count in defendant's case.　Section 4-2002(a) of the 2012 version of the Counties Code provides, in pertinent part:

> "State's attorneys shall be entitled to a $2 fee to be paid by
>
> the defendant on a judgment of guilty or a grant of supervision for a
>
> violation of any provision of the Illinois Vehicle Code or any
>
> felony, misdemeanor, or petty offense to discharge the expenses of
>
> the State's Attorney's office for establishing and maintaining
>
> automated record keeping systems."　55 ILCS 5/4-2002(a) (West
>
> 2012).

Public Act 97-673 amended section 4-2002 of the Counties Code to add the above-quoted

- 35 -

provision, which does not appear in the version of section 4-2002 in effect when defendant committed the offenses in question. Pub. Act 97-673, § 5 (eff. June 1, 2012). If the assessment is a fine, we must vacate its imposition as violating the prohibition on *ex post facto* punishment. *People v. Dalton*, 406 Ill. App. 3d 158, 163, 941 N.E.2d 428, 434 (2010) ("The prohibition against *ex post facto* laws applies only to laws that are punitive. It does not apply to fees, which are compensatory instead of punitive.").

¶ 115          The plain language of section 4-2002(a) evidences the legislature's intent the $2 assessment be compensatory in nature. The assessment is to be used to "discharge the expenses of the State's Attorney's office for establishing and maintaining automated record keeping systems." 55 ILCS 5/4-2002(a) (West 2012). Because the assessment is intended to reimburse the State's Attorneys for their expenses related to automated record-keeping systems, the assessment is not punitive in nature. The assessment is a fee. Thus, the circuit clerk could properly impose the assessment against defendant, even though the provision authorizing the assessment became law after defendant committed the offenses charged in this case.

¶ 116          The plain language of section 4-2002(a) clearly evidences the legislature's intent this fee be imposed on each count in a defendant's case. A defendant must pay the $2 fee "on a judgment of guilty or a grant of supervision for *** any felony, misdemeanor, or petty offense." 55 ILCS 5/4-2002(a) (West 2012). Because a defendant may properly be charged with and found guilty of multiple felony, misdemeanor, or petty offenses in a single case, the $2 State's Attorney automation fees could be imposed on each count in defendant's case. This conclusion is bolstered by the language in section 4-2002(a), providing "[n]o fees shall be charged on more than 10 counts in any one indictment or information on trial and conviction; nor on more than 10 counts against

any one defendant on pleas of guilty." *Id*. The circuit clerk properly assessed two State's Attorney automation fees against defendant.

¶ 117                     (h) The Arrestee's Medical Assessments:
A Noncreditable Fine That Can Be Imposed by the Court on Each Count

¶ 118          The record shows the circuit clerk imposed a $10 arrestee's medical assessment on each count in defendant's case. Section 17 of the County Jail Act (Jail Act) (730 ILCS 125/17 (West 2010)) provides, in pertinent part:

> "The county shall be entitled to a $10 fee *for each conviction*
> *or order of supervision* for a criminal violation, other than a petty
> offense or business offense. The fee shall be taxed as costs to be
> collected from the defendant, if possible, upon conviction or entry
> of an order of supervision. *The fee shall not be considered a part of*
> *the fine for purposes of any reduction in the fine*.
>
> All such fees collected shall be deposited by the county in a
> fund to be established and known as the County Jail Medical Costs
> Fund. Moneys in the Fund shall be used solely for reimbursement
> to the county of costs for medical expenses and administration of the
> Fund." (Emphases added.) 730 ILCS 125/17 (West 2010).

¶ 119          In *Larue*, this court held the arrestee's medical fee, despite its label as a "fee," was actually a fine and could not be imposed by the circuit clerk. *Larue*, 2014 IL App (4th) 120595, ¶ 57. In support of this conclusion, we noted a defendant can be required to pay the fine even though defendant did not receive medical treatment or costs. *Id*.; see *People v. Jackson*, 2011 IL 110615, ¶¶ 24, 27, 955 N.E.2d 1164. Additionally, classifying the arrestee's medical assessment

- 37 -

as a fee would render the language in the statute providing, "[t]he fee shall not be considered a part of the fine for purposes of any reduction in the fine" (730 ILCS 125/17 (West 2010)), superfluous because fees are not subject to credit under section 110-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2010)). *People v. Sulton*, 395 Ill. App. 3d 186, 190, 916 N.E.2d 642, 645-46 (2009). Because the arrestee's medical assessment is a fine, the clerk could not properly impose it.

¶ 120    The plain language of section 17 of the Jail Act clearly evidences the legislature's intent this fine be imposed on *each count* in a defendant's case. The fine is to be imposed "for each conviction or order of supervision." 730 ILCS 125/17 (West 2010). A defendant may properly be convicted of multiple offenses in a single case. Because a defendant may properly be convicted on multiple counts in a given case, the trial court must reimpose the arrestee's medical fine on each count in defendant's case.

¶ 121                    (i) The Spinal-Cord-Research Assessment:
                A Noncreditable Fine Improperly Imposed by the Clerk

¶ 122    The record shows the circuit clerk imposed a $5 spinal-cord-research assessment against defendant *on count I only*. Section 5-9-1.1(c) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-9-1.1(c) (West 2010)) provides:

> "(c) In addition to any penalty imposed under subsection (a)
> of this Section, a fee of [$5] shall be assessed by the court, the
> proceeds of which shall be collected by the Circuit Clerk and
> remitted to the State Treasurer under Section 27.6 of the Clerks of
> Courts Act for deposit into the Spinal Cord Injury Paralysis Cure
> Research Trust Fund. This additional fee of [$5] shall not be

considered a part of the fine for purposes of any reduction in the fine for time served either before or after sentencing." 730 ILCS 5/5-9-1.1(c) (West 2010).

¶ 123    In *Jones*, 223 Ill. 2d at 599, 861 N.E.2d at 985, our supreme court held the spinal-cord-research fee, despite its statutory label as a fee, is a fine.   We vacate the spinal-cord-research fine imposed by the circuit clerk in this case.   On remand, the trial court shall reimpose the fine as mandated by the statute.   Because the clerk imposed this fine on count I only, we need not address whether the fine can be properly imposed on each count in a defendant's case.

¶ 124                            (j) The Trauma-Fund Assessment:
                         A Fine Improperly Imposed by the Clerk

¶ 125    The record shows the circuit clerk imposed a $100 trauma-fund assessment *on count I only*.   Section 5-9-1.1(b) of the Unified Code provides:

"(b) *In addition to any penalty* imposed under subsection (a) of this Section, a *fine* of $100 shall be levied by the court, the proceeds of which shall be collected by the Circuit Clerk and remitted to the State Treasurer under Section 27.6 of the Clerks of Courts Act for deposit into the Trauma Center Fund for distribution as provided under Section 3.225 of the Emergency Medical Services (EMS) Systems Act."   (Emphases added.)   730 ILCS 5/5-9-1.1(b) (West 2010).

¶ 126    In *Jones*, 223 Ill. 2d at 593, 861 N.E.2d at 981-82, our supreme court held the trauma-fund assessment authorized under section 5-9-1.1(b) of the Unified Code was clearly a fine because the legislature labeled it as such.   We vacate the trauma-fund fine imposed by the circuit

clerk after defendant's sentencing.   On remand, the trial court must reimpose the trauma-fund fine as mandated by the statute.   Because the clerk imposed this fine on count I only, we need not address whether the fine can be properly imposed on each count in a defendant's case.

¶ 127                              (k) The Traffic/Criminal Surcharges:
                              A Fine Improperly Imposed by the Clerk

¶ 128          The record shows the circuit clerk imposed a $590 criminal surcharge on count I and a $10 criminal surcharge on count II.   Section 5-9-1(c) of the Unified Code provides, in pertinent part:

> "(c) *There shall be added to every* fine *imposed* in
>
> sentencing for a criminal or traffic offense, except an offense
>
> relating to parking or registration, or offense by a pedestrian, *an*
>
> *additional penalty* of $10 for each $40, or fraction thereof, of fine
>
> imposed."   (Emphases added.)   730 ILCS 5/5-9-1(c) (West 2010).

¶ 129          The plain language of section 5-9-1(c) of the Unified Code clearly shows the legislature intended this assessment to be punitive in nature.   The statute refers to the assessment as "an additional penalty."   730 ILCS 5/5-9-1(c) (West 2010).   Further, the statute does not indicate the assessment is to be used to reimburse the county or the State for the expenses related to the prosecution of a defendant.   Because the circuit clerk imposed the criminal surcharges after defendant was sentenced by the trial court, we vacate these fines.

¶ 130          The plain language of section 5-9-1(c) shows the legislature intended this assessment be imposed on *each count* in a criminal case.   The statute provides the fine is to be "imposed in sentencing for a criminal or traffic offense."   730 ILCS 5/5-9-1(c) (West 2010). Because a defendant may properly be sentenced for multiple offenses in a single case, a trial judge

may properly impose this fine on each count.

¶ 131        On remand, the trial court must reimpose a criminal surcharge on each count in defendant's case.   We previously noted "[t]his may require the fine to be recalculated, which will require the trial court to calculate the total fines on each count and assess an additional $10 for each $40, or fraction thereof, of fine imposed."   *Warren*, 2014 IL App (4th) 120721, ¶ 124, 16 N.E.3d 13 (citing 730 ILCS 5/5-9-1(c) (West 2010); see *People v. Williams*, 2013 IL App (4th) 120313, ¶ 21, 991 N.E.2d 914 (" 'Lump Sum Surcharge' " imposed pursuant to section 5-9-1(c) of the Unified Code is to be calculated before the VCVA assessment; the surcharge is added to the total fines and the VCVA assessment is calculated based on the new total); *People v. O'Laughlin*, 2012 IL App (4th) 110018, ¶ 24, 979 N.E.2d 1023 (amount of surcharge fine is based upon the gross amount of fines levied against defendant; VCVA assessment to be imposed after surcharge is calculated)).   However, in accordance with *Castleberry*, we cannot order the trial court to impose additional penalties on defendant.   The trial court should reimpose a $590 criminal surcharge on count I and a $10 criminal surcharge on count II.

¶ 132                    (l) The Juvenile Expungement Fund Assessments:
                         A Fine Improperly Imposed by the Clerk

¶ 133        The record shows the circuit clerk imposed a $30 Juvenile Expungement Fund assessment on each count in defendant's case.   The $30 juvenile-expungement assessment is listed on the clerk's printout as a $10 assessment for the Clerk Operations and Administrative Fund, a $10 assessment for the State's Attorney Office Fund (the $10 assessment for the State's Attorney is included in the $40 charge listed for the State's Attorney on the clerk's printout), and a $10 assessment for the State Police Services Fund.   Section 5-9-1.17 of the Unified Code provides, in pertinent part:

"(a) There shall be added to every penalty imposed in sentencing for a criminal offense *an additional fine* of $30 to be imposed upon a plea of guilty or finding of guilty resulting in a judgment of conviction.

(b) Ten dollars of each such *additional fine* shall be remitted to the State Treasurer for deposit into the State Police Services Fund ***, $10 shall be paid to the State's Attorney's Office that prosecuted *the criminal offense*, and $10 shall be retained by the Circuit Clerk for administrative costs associated with the expungement of juvenile records and shall be deposited into the Circuit Court Clerk Operation and Administrative Fund."

(Emphases added.)   730 ILCS 5/5-9-1.17 (West 2010).

¶ 134    The plain language of section 5-9-1.17 clearly shows the legislature intended this assessment to be a fine.   The statute refers to the assessment as "an additional fine" that is to "be added to every penalty imposed in sentencing for a criminal offense."   730 ILCS 5/5-9-1.17(a) (West 2010).   Further, "the charge [is] used to expunge juvenile records and is in no way related to the prosecution of the adult defendant against whom the charge is levied."   *People v. Wynn*, 2013 IL App (2d) 120575, ¶ 16, 3 N.E.3d 400; see *Larue*, 2014 IL App (4th) 120595, ¶ 56 (vacating the $30 juvenile-expungement fine because the clerk lacked authority to assess it). Because the $30 juvenile-expungement assessment (including the three separate $10 assessments contained therein) is a fine, the circuit clerk cannot properly impose it.   We vacate the $30 juvenile-expungement fine—listed as three separate $10 charges for the Circuit Clerk Operations

- 42 -

and Administrative Fund, State's Attorney's Office Fund, and State Police Services Fund—imposed on each count in defendant's case. (We note our vacatur of the $10 assessment paid to the State's Attorney's Office that prosecuted the offense under section 5-9-1.17 does not affect the $30 to which the State's Attorney was entitled on each count for the two felony convictions in this case under section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2010)).)

¶ 135    The plain language of section 5-9-1.17 clearly shows the legislature intended this fine to be imposed on *each count* in a defendant's case. The statute provides the fine is to "be added to every penalty imposed in sentencing for a *criminal offense*." (Emphasis added.) 730 ILCS 5/5-9-1.17(a) (West 2010). The fine is "to be imposed upon a plea of guilty or finding of guilty resulting in a judgment of conviction." 730 ILCS 5/5-9-1.17(a) (West 2010). Because a defendant can properly be found guilty of and sentenced for multiple criminal offenses in a case, the juvenile-expungement fine can be properly imposed on each count in a defendant's case. On remand, the trial court must reimpose the $30 juvenile-expungement fine on each count in defendant's case.

¶ 136                    (m) The Drug-Court Assessments:
                    A Fine Improperly Imposed by the Clerk

¶ 137    The record shows the circuit clerk imposed a $5 drug-court assessment on each count in defendant's case. Section 5-1101(f) of the Counties Code provides, in pertinent part:

"(f) In each county in which a drug court has been created,

the county may adopt a mandatory fee of up to $5 to be assessed as

provided in this subsection. Assessments collected by the clerk of

the circuit court pursuant to this subsection must be deposited into

- 43 -

an account specifically for the operation and administration of the

drug court.   ***   The fees are to be paid as follows:

　　　　　***

　　　　　(2) a fee of up to $5 paid by the defendant on a

judgment of guilty or a grant of supervision under Section

5-9-1 of the Unified Code of Corrections for a felony; for a

Class A, Class B, or Class C misdemeanor; for a petty

offense; and for a business offense."   55 ILCS 5/5-1101(f)

(West 2010).

¶ 138　　　　In this case, the $5 drug-court assessment imposed by the circuit clerk was a fine, despite its label as a "fee," because the assessment is intended to be used "for the operation and administration of the drug court."   55 ILCS 5/5-1101(f) (West 2010).   Because defendant never participated in drug court, this assessment did not reimburse the state for the costs of prosecuting defendant.   *People v. Unander*, 404 Ill. App. 3d 884, 886, 936 N.E.2d 795, 797 (2010); *Rexroad*, 2013 IL App (4th) 110981, ¶ 53, 992 N.E.2d 3 ("Although the drug court assessment pursuant to section 5-1101(f) of the Counties Code [citation] is labeled a fee, it is actually a fine where, as here, defendant did not participate in drug court.").   Because the clerk imposed the $5 drug-court fines after sentencing, we vacate these fines.

¶ 139　　　　The plain language of section 5-1101(f)(2) of the Counties Code shows the legislature intended this fine to be imposed on *each count* in a defendant's case.   The statute provides the assessment is to be paid by a defendant "on a judgment of guilty or a grant of supervision."   55 ILCS 5/5-1101(f)(2) (West 2010).   Because a defendant may have a judgment

- 44 -

of guilty rendered on each count within a case, the plain language of the statute clearly evidences the legislature's intent a defendant may be assessed the drug-court fine on each count within his case. On remand, the trial court must reimpose a $5 drug-court fine on each count in defendant's case.

¶ 140                                (n) The VCVA Assessments:
                         A Noncreditable Fine Improperly Imposed by the Clerk

¶ 141        The record shows the circuit clerk imposed a $236 VCVA assessment on count I and a $4 VCVA assessment on count II. Section 10(b) of the Violent Crime Victims Assistance Act provides, in pertinent part:

> "[T]here shall be *an additional penalty* collected from each
>
> defendant upon conviction of any felony *** of $4 for each $40, or
>
> fraction thereof, of fine imposed. *** *Such additional penalty*
>
> *shall not be considered a part of the fine for purposes of any*
>
> *reduction made in the fine for time served either before or after*
>
> *sentencing*." (Emphases added.) 725 ILCS 240/10(b) (West
>
> 2010).

¶ 142        The plain language of section 10(b) shows the legislature intended this assessment to be imposed as punishment in a criminal case. The statute labels the assessment "an additional penalty" (725 ILCS 240/10(b) (West 2010)), which shows the legislature intended this assessment to be punitive in nature. Further, courts have previously held, some for over 25 years, the circuit clerk is without authority to impose the VCVA assessment, referring to the assessment as a fine. *Rexroad*, 2013 IL App (4th) 110981, ¶ 55, 992 N.E.2d 3; *People v. Wisotzke*, 204 Ill. App. 3d 44, 50, 561 N.E.2d 1310, 1313 (1990) (Second District); *People v. Scott*, 152 Ill. App. 3d 868, 873,

505 N.E.2d 42, 46 (1987) (Fifth District); *People v. Tarbill*, 142 Ill. App. 3d 1060, 1061, 492 N.E.2d 942, 942 (1986) (Third District). We vacate the VCVA fines in this case, as those assessments could not properly be imposed by the clerk.

¶ 143     The plain language of the statute clearly evidences the legislature's intent the fine be assessed on *each count*, as the statute provides the penalty is to be imposed upon conviction. 725 ILCS 240/10(b) (West 2010). Because a defendant may be convicted of multiple offenses within a single case, defendant could properly be ordered to pay a VCVA fine on each count.

¶ 144     On remand, the trial court must reimpose a VCVA fine on each count. We previously noted, "[t]his task may require the court to recalculate the fine, which will require the court to calculate the total fines, including the traffic/criminal surcharge, imposed pursuant to each count and impose an additional penalty of $4 for each $40, or fraction thereof, of fine imposed." *Warren*, 2014 IL App (4th) 120721, ¶ 137, 16 N.E.3d 13 (citing 725 ILCS 240/10(b) (West 2010)); see *Williams*, 2013 IL App (4th) 120313, ¶ 21, 991 N.E.2d 914 (" 'Lump Sum Surcharge' " imposed pursuant to section 5-9-1(c) of the Unified Code is to be calculated before the VCVA assessment; surcharge is added to the total fines and VCVA assessment is calculated based on the new total); *O'Laughlin*, 2012 IL App (4th) 110018, ¶ 24, 979 N.E.2d 1023 (amount of surcharge fine is based upon the gross amount of fines levied against defendant; VCVA assessment to be imposed after surcharge is calculated)). However, in accordance with *Castleberry*, we cannot order the trial court to impose additional penalties on defendant. The trial court should reimpose a $236 VCVA assessment on count I and a $4 VCVA assessment on count II.

¶ 145          (o) The State Police Operations Assessments:
                 A Fine Improperly Imposed by the Clerk

¶ 146     The record shows the circuit clerk imposed a $10 State Police operations

assessment on each count in defendant's case. Subsection (1.5) of section 27.3a of the Clerks of Courts Act (Clerks Act) (705 ILCS 105/27.3a(1.5) (West 2010)) provides, in pertinent part:

> "1.5. Starting on the effective date of this amendatory Act of the 96th General Assembly, a clerk of the circuit court in any county that imposes a fee pursuant to subsection 1 of this Section [(the automation fee)], shall charge and collect an additional fee in an amount equal to the amount of the fee imposed pursuant to subsection 1 of this Section. This additional fee shall be paid by the defendant *in any felony*, traffic, misdemeanor, local ordinance, or conservation *case* upon a judgment of guilty or grant of supervision." (Emphases added.) 705 ILCS 105/27.3a(1.5) (West 2010).

Subsection (5) of section 27.3a of the Clerks Act (705 ILCS 105/27.3a(5) (West 2010)) requires the clerk to remit this additional assessment to the State Treasurer for deposit into the State Police Operations Assistance Fund.

¶ 147       In *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31, 979 N.E.2d 1030, this court held the State Police operations assistance fee is a fine for the purpose of calculating a defendant's VCVA fine. See 725 ILCS 240/10(b) (West 2010). Because this assessment is a fine, the circuit clerk could not properly impose this assessment against defendant. We vacate its imposition.

¶ 148       The plain language of section 27.3a(1.5) clearly evidences the legislature's intent this fine be assessed *only once* in a defendant's case. The fee is to be paid by the defendant "in any felony, traffic, misdemeanor, local ordinance, or conservation case." 705 ILCS 105/27.3a(1.5)

(West 2010). Because the language of the statute refers to *cases*, and not individual convictions, the State Police operations assistance fine may be assessed only once per case. See *Larue*, 2014 IL App (4th) 120595, ¶ 64. On remand, the trial court must reimpose this fine on only one of the two counts.

¶ 149                                    3. *The DNA Analysis Fee*

¶ 150          Defendant argues the circuit clerk improperly assessed defendant a $250 DNA analysis fee after the trial court conditionally ordered the fee at defendant's sentencing hearing. Defendant contends the imposition of this fee is void and must be vacated. The State concedes the $250 DNA analysis fee must be vacated. We accept the State's concession.

¶ 151          While the DNA analysis assessment is a fee (see *People v. Guadarrama*, 2011 IL App (2d) 100072, ¶ 13, 955 N.E.2d 615 (holding the DNA analysis assessment is a "fee" because "the fee is used to cover the costs incurred in collecting and testing a DNA sample that is taken from a defendant convicted of a qualifying offense"))—meaning the circuit clerk could properly impose it if a defendant was ordered to submit to DNA analysis—its imposition in this case was not authorized and, thus, we vacate the $250 DNA analysis fee. In *People v. Marshall*, the supreme court found the defendant was improperly ordered to submit to DNA analysis and pay the attendant fee where he had previously submitted a DNA sample for analysis and paid the fee. *People v. Marshall*, 242 Ill. 2d 285, 302-03, 950 N.E.2d 668, 679 (2011). In *Marshall*, the court held trial courts are authorized "to order the taking, analysis and indexing of a qualifying offender's DNA, and the payment of the analysis fee only where that defendant is not currently registered in the DNA database." *Id*. (Based on this language, we also conclude the fee cannot be imposed on each count in a case.)

- 48 -

¶ 152    In this case, the trial court's order regarding DNA analysis was consistent with the supreme court's holding in *Marshall*.   At defendant's July 2012 sentencing hearing, the court stated as follows: "If [defendant] has not already done so—and I can't imagine how he has not—then he would have to submit a specimen for genetic testing in accordance with the statute, and only then would he have to pay the genetic marker grouping analysis fee of $250."   In other words, the court conditioned the imposition of the DNA analysis fee on whether defendant had previously submitted a specimen for testing.

¶ 153    Defendant has attached as an appendix to his brief a printout from the Illinois State Police, Division of Forensic Services, which shows defendant submitted a blood sample for DNA analysis on February 17, 2005.   The record confirms defendant previously submitted a DNA sample for a previous case.   The PSI states, "On [February 17, 2005], the defendant submitted a DNA sample on a previous case."   Yet, the circuit clerk's printout containing the fines and fees assessed against defendant in this case shows he was assessed a $250 DNA analysis fee.   Because the record shows defendant submitted a DNA sample for analysis in 2005, the DNA analysis fee imposed by the clerk in this case is void.   *Id*. at 302, 950 N.E.2d at 679.   We vacate the $250 DNA analysis fee imposed by the clerk.

¶ 154                    4. *The Street-Value Fine*

¶ 155    The State argues the trial court, on remand, must increase the $340 street-value fine imposed to reflect the value of all the crack cocaine seized on March 18, 2011.   Specifically, the State argues defendant was found guilty of unlawful possession with intent to deliver 7.2 grams of crack cocaine, which included the 2.6 grams of crack cocaine located in Rosas's vagina.   The State argues the court failed to include the 2.6 grams of crack cocaine located in Rosas's vagina in

its calculation of the street-value fine. The State extrapolates the value of the additional crack cocaine based on the per-gram value of the crack cocaine, deduced from the evidence taken at trial on the value of the 4.6 grams found in the hotel room ($340 divided by 4.6 grams is $73.91 per-gram value), and seeks to increase the fine by $192 ($73.91 per gram multiplied by 2.6 grams is $192).

¶ 156        In his reply brief, defendant characterizes the State's argument as an unauthorized cross-appeal. Specifically, defendant argues (1) the State's contention is a free-standing claim of error; (2) the State may not properly appeal the imposition of a fine because such appeals by the State are not authorized by Illinois Supreme Court Rule 604(a) (eff. July 1, 2006); and (3) the order imposing the street-value fine is "at best" voidable, not void, and as such, the State forfeited its claim of error.

¶ 157        We previously rejected defendant's characterization of the State's pointing out of a sentencing error to be a "free-standing claim of error," because defendant put his entire sentence at issue. *Warren*, 2014 IL App (4th) 120721, ¶ 150, 16 N.E.3d 13. Specifically, we found defendant placed his entire sentence, which included the street-value fine (see *Chester*, 2014 IL App (4th) 120564, ¶ 32, 5 N.E.3d 227 (fines are part of sentence a judge must impose)), before this court for review by (1) challenging his conviction and sentence in his notice of appeal; and (2) seeking an additional two days' credit against his sentence, which would be accompanied by a $5 per day credit against creditable fines, one of which is the street-value fine. *Warren*, 2014 IL App (4th) 120721, ¶ 150, 16 N.E.3d 13. We further concluded, even if we considered the State's street-value fine argument to be a "free-standing claim of error," the State could seek to correct a void or partially void judgment on appeal. *Id*.  ¶¶ 151-52 ("where the trial court ordered a

- 50 -

sentence less than that mandated by statute, the sentence was 'illegal and void' and 'the appellate court ha[d] the authority to correct the sentence at any time, and Rule 604(a)(1) [did] not limit the State's right to appeal' " (quoting *people v. Malchow*, 306 Ill. App. 3d 665, 675-76, 714 N.E.2d 583, 591(1999)).

¶ 158     After our review, we determined defendant's sentence was void to the extent the street-value fine ordered by the trial court was less than the street-value of all the crack cocaine recovered in this case and directed the trial court on remand to increase the street-value fine to reflect the value of all the crack cocaine seized.   In accordance with *Castleberry*, we cannot order the trial court to impose additional penalties on defendant.   The $340 street-value fine previously imposed by the trial court should be neither increased nor vacated on remand.

¶ 159                    5. *Other Issues With Fines and Fees*

¶ 160     Upon our examination of the record, we found other errors neither party raised regarding the imposition of the fines and fees in this case.   For instance, the trial court, at defendant's sentencing hearing, ordered defendant to pay a $2,000 mandatory assessment pursuant to section 411.2(a)(2) of the Illinois Controlled Substances Act (720 ILCS 570/411.2(a)(2) (West 2010)).   The circuit clerk's printout, however, shows the clerk only assessed a $1,275 mandatory assessment.   The record provides no explanation for the disparity between what the court expressly ordered and what the clerk later assessed.   Presumably, the clerk assessed the $2,000 mandatory assessment as ordered by the court and used the $725 credit to which defendant is entitled to offset part of the assessment, leaving $1,275 of the mandatory assessment outstanding.

¶ 161     The trial court also ordered defendant to pay a crime-lab analysis fee of $100 during his sentencing hearing.   Although the circuit clerk's printout contains an entry for the

- 51 -

crime-lab analysis fee, no dollar amount is listed next to the entry. The record again provides no explanation for the disparity between what the court expressly ordered and the clerk's failure to assess it.

¶ 162 On remand, the trial court, when reimposing the fines vacated herein, should ensure the amended sentencing judgment containing the fines and fees assessed against defendant contains the $2,000 mandatory assessment (720 ILCS 570/411.2(a)(2) (West 2010)) and the $100 crime-lab analysis fee (730 ILCS 5/5-9-1.4(b) (West 2010)) ordered by the court during defendant's sentencing hearing, as well as the amounts creditable against either.

¶ 163                          C. Sentencing Credit

¶ 164 We initially note the parties agree the PSI lists the incorrect dates for defendant's first period of pretrial incarceration. The PSI indicates defendant was in custody for this offense starting on March 21, 2011, and ending on July 1, 2011, when he posted bond. However, the parties agree and the record confirms defendant was in custody for this offense starting March 18, 2011, when he was arrested. The PSI also indicates defendant was in custody for this offense on July 2, 2012, which was the date he was sentenced. The parties agree defendant should not be credited for July 2, 2012. See *People v. Williams*, 239 Ill. 2d 503, 510, 942 N.E.2d 1257, 1262 (2011) (holding "the date a defendant is sentenced and committed to the Department [of Corrections] is to be counted as a day of sentence and not as a day of presentence credit").

¶ 165 The parties do not agree as to the total amount of days for which defendant is entitled credit. Defendant initially argued he was entitled to two additional days of credit toward his sentence for his time in pretrial custody for March 18, 2011, through March 20, 2011 (less one day for July 2, 2012), and $10 of additional monetary credit toward the creditable fines imposed

- 52 -

upon him.

¶ 166        The State responds by arguing defendant is not entitled to the two additional days

of credit.    Specifically, the State argues where, as here, a defendant is out on bond for one offense

and is subsequently arrested and placed in custody for another offense, the defendant is returned to

custody on the initial offense when his or her bond is revoked or withdrawn (*People v. Arnhold*,

115 Ill. 2d 379, 383, 504 N.E.2d 100, 101 (1987)), unless he is surrendered on the initial offense to

serve simultaneous custody for both offenses (*People v. Robinson*, 172 Ill. 2d 452, 459, 667

N.E.2d 1305, 1308 (1996)).    Using the day defendant's bond was revoked, May 24, 2012, the

State contends the calculation of time served contained in the PSI was correct.

¶ 167        In his reply brief, defendant argues he is actually entitled to *three* additional days of

credit toward his sentence pursuant to section 5-4.5-100(c) of the Unified Code (730 ILCS

5/5-4.5-100(c) (West 2012)) and *People v. Cook*, 392 Ill. App. 3d 147, 150-51, 910 N.E.2d 208,

210 (2009), but he abandons his argument he is entitled to additional monetary credit against his

creditable fines.    Specifically, defendant argues the State is arguing for the first time on appeal the

court erred in granting defendant credit for May 22, 2012, and May 23, 2012.    Defendant points

out the State relied on facts not in the record—the Champaign County circuit clerk's website—to

come to its calculation of credit.    Using information from the Champaign County circuit clerk's

website, defendant ascertained he was in custody on May 21, 2012, through May 23, 2012, for an

offense he committed while on bail in Champaign County case No. 12-CF-773.    Because the

charges in case No. 12-CF-773 were ultimately dropped, defendant will not be awarded credit for

the three days he spent in jail as a result of the newer charges.    See 730 ILCS 5/5-4.5-100(c) (West

2010).    Therefore, defendant urges he is entitled to credit for May 21, 2012, May 22, 2012, and

May 23, 2012, for a total of 148 days' credit.

¶ 168        Defendant has the burden to present a record showing the error of which he complains.   *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984).   In this case, the trial court ordered, with agreement of the parties, defendant is entitled to 145 days' credit toward his sentence.   To get any credit for May 21, 2012, through May 23, 2012, defendant must show he tendered his surrender on the offenses charged in the instant case.   See *Robinson*, 172 Ill. 2d at 459, 667 N.E.2d at 1308.   The record contains no indication defendant tendered his surrender for the offenses charged in this case, and as such, he is not entitled to credit for May 21, 2012, through May 23, 2012.   The record does show defendant's bond was revoked on May 24, 2012.   Using the date defendant's bond was revoked, the 145 days' credit listed in the PSI is correct—although the dates relied on to reach this calculation are incorrect.

¶ 169        Following our initial decision, defendant filed a petition for rehearing in this court. In his petition for rehearing, defendant argues our decision in this case is inconsistent with *Cook*, where we awarded defendant additional credit against his sentence pursuant to section 5-8-7(c) of the Unified Code (730 ILCS 5/5-8-7(c) (West 2006)), which has since been renumbered as section 5-4.5-100(c) of the Unified Code.   See *People v. Clark*, 2014 IL App (4th) 130331, ¶ 21.   Section 5-4.5-100(c) of the Unified Code provides:

> "CREDIT; TIME IN CUSTODY; FORMER CHARGE. An
> offender arrested on one charge and prosecuted on another charge
> for conduct that occurred prior to his or her arrest shall be given
> credit on the determinate sentence or maximum term and the
> minimum term of imprisonment for time spent in custody under the

former charge not credited against another sentence." 730 ILCS 5/5-4.5-100(c) (West 2010).

¶ 170    In *Cook*, the State charged the defendant, on November 16, 2007, with theft for conduct occurring on November 2, 2007. *Cook*, 392 Ill. App. 3d at 148, 910 N.E.2d at 209. On December 10, 2007, the State charged the defendant, in a separate case, with unlawful possession of a controlled substance. *Id*. The conduct underlying the possession charge was committed while the defendant was out on bail for the original theft charge. *Id*. On January 18, 2008, the State charged the defendant with aggravated criminal sexual abuse for conduct occurring on August 31, 2007. *Id*. (Later in the opinion, the majority states, "On January 30, 2008, while defendant was released on bond in both of his 2007 cases, defendant was arrested and charged with aggravated criminal sexual abuse (his 2008 case)." *Id*. at 149, 910 N.E.2d at 209.). In exchange for a guilty plea as to the theft and possession charges, the State agreed to drop the remaining charge of aggravated criminal sexual abuse. *Id*. at 148-49, 910 N.E.2d at 209.

¶ 171    After his arrest on January 30, 2008, for aggravated criminal sexual abuse, the defendant spent 26 days in custody before he, on February 25, 2008, surrendered his bond in the theft and possession cases. *Id*. at 149, 910 N.E.2d at 209-10. We awarded the defendant the additional 26 days' credit against his sentence where he "(1) was arrested for aggravated criminal sexual abuse ***, (2) was prosecuted for theft over $300 *** which involved conduct that occurred prior to his arrest in [the aggravated-criminal-sexual-abuse case], and (3) did not receive credit for the time spent in custody in [the aggravated-criminal-sexual-abuse case] against another sentence." *Id*. at 150, 910 N.E.2d at 210.

¶ 172    While defendant's petition for rehearing was pending following our initial decision,

this court decided *Clark*, 2014 IL App (4th) 130331. In *Clark*, we declined to follow the interpretation and analysis of section 5-4.5-100(c) set forth by the majority in *Cook*. *Id.* ¶¶ 23-24. Instead, we elected to follow the analysis set forth by Justice Pope in her dissent and held defendant was not entitled to additional credit where he sought credit against his sentence for the original charge for time he spent in custody on a subsequent charge. *Id.* ¶ 25.

¶ 173          Justice Pope's reading of subsection (c) in her dissent in *Cook* (*Cook*, 392 Ill. App. 3d at 151-52, 910 N.E.2d at 211-12 (Pope, J., dissenting)) is consistent with *Robinson*, wherein the supreme court explained the purpose of section 5-4.5-100(c) was "to 'prevent the State from dropping an *initial* charge and recharging a defendant with *another crime*, with the intent of denying credit for time spent in jail on the *first* charge.' " (Emphases added.) *Robinson*, 172 Ill. 2d at 460, 667 N.E.2d at 1309 (quoting *People v. Townsend*, 209 Ill. App. 3d 987, 990, 568 N.E.2d 946, 948 (1991)); see also *People v. Kane*, 136 Ill. App. 3d 1030, 1035, 484 N.E.2d 296, 300 (1985) ("The purpose of subsection (c) is to insure credit for all confinement since arrest *in the circumstance where the original charge is dropped in favor of a new charge* which results in conviction and imprisonment." (Emphasis added and internal quotation marks omitted.)). The *Robinson* court determined section 5-4.5-100(c) did not apply "[b]ecause the initial charge against defendant was not dropped in favor of a subsequent charge." *Robinson*, 172 Ill. 2d at 461, 667 N.E.2d at 1309.

¶ 174          Here, defendant seeks credit against his sentence for the initial charges, in case No. 11-CF-443, for time he spent in custody as a result of a subsequent charge, in case No. 12-CF-773. Because the initial charges were not dropped in favor of the subsequent charge, defendant is not entitled to credit for May 21, 2013, to May 23, 2013, under section 5-4.5-100(c) of the Unified

Code. *Id.*; *Clark*, 2014 IL App (4th) 130331, ¶ 26. We affirm the court's order finding defendant is entitled to 145 days' credit against his sentence and $725 credit toward any creditable fines imposed in this case.

¶ 175 In our initial decision, we highlighted the vast amount of judicial resources being expended in the appellate court to resolve issues concerning the ever-expanding morass of fines and fees enacted by the legislature. *Warren*, 2014 IL App (4th) 120721, ¶ 170, 16 N.E.3d 13 (citing *People v. Folks*, 406 Ill. App. 3d 300, 309, 943 N.E.2d 1128, 1135 (2010); *O'Laughlin*, 2012 IL App (4th) 110018, ¶ 28, 979 N.E.2d 1023; *Williams*, 2013 IL App (4th) 120313, ¶ 25, 991 N.E.2d 914; *Chester*, 2014 IL App (4th) 120564, ¶ 35, 5 N.E.3d 227; *Montag*, 2014 IL App (4th) 120993, ¶ 38, 5 N.E.3d 246). While the supreme court's decision in *Castleberry* will arguably lessen the burden on the appellate court, we still echo our request in *Folks* for a "comprehensive legislative revision in the assessment of fines, fees, costs and the $5-per-day credit for time spent in custody prior to sentencing." *Folks*, 406 Ill. App. 3d at 309, 943 N.E.2d at 1135. The legislature continues to enact new fines, fees, and costs—in this case, leading to the imposition of 33 separate assessments. See generally J. Donnelly & S. Dellinger, *The Mandatory Criminal Fines Conundrum*, 103 Ill. B.J. 28 (April 2015). This adds more complexity to many cases where the monetary assessments may not even be collected. Perhaps the legislature will answer our call.

¶ 176 We stress the importance of the need for all parties involved—the trial court, the State's Attorney's office, the criminal defense bar, and the circuit clerk's office—to ensure fines are properly imposed by the trial court with the attorneys and the defendant in attendance and on notice. This process requires active participation from the parties. We understand it is a burden to navigate the murky waters of fines and fees, but it is a burden required by law. We recognize it

is the long-standing practice of the circuit court clerks to impose the fees and costs associated with criminal cases, but this does not excuse the similar treatment of fines, which are a component of the sentence to be imposed by the sentencing judge.  Fines are a component of the sentence, and we require the help of the parties to fulfill our duties in resolving these issues on review.  This requires the statement of facts in each brief to identify the fines imposed and whether the court or circuit clerk imposed them, with citations to the record.  See *Chester*, 2014 IL App (4th) 120564, ¶ 35, 5 N.E.3d 227.

¶ 177                                III. CONCLUSION

¶ 178          We affirm in part and vacate in part the trial court's judgment and remand for the trial court to reimpose the mandatory fines vacated herein.  We encourage the trial court to review the reference sheet this court provided in *Williams*, 2013 IL App (4th) 120313, 991 N.E.2d 914 (appendix), to assist in ensuring the statutorily mandated fines in criminal cases are properly imposed in future cases.  The State's Attorney's office can best provide guidance as to which fines the county has required by ordinance or resolution.  See *Pohl*, 2012 IL App (2d) 100629, ¶¶ 11, 21, 969 N.E.2d 508.  As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.  55 ILCS 5/4-2002(a) (West 2012).

¶ 179          Affirmed in part and vacated in part; cause remanded with directions.