NOTICE

Decision filed 03/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200138-U

NO. 5-20-0138

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 18-CF-360 |
| | ) | |
| JACOB FAIRBANKS, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's conviction is affirmed where the evidence presented at trial was not closely balanced, and, thus, the defendant cannot establish that the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) constituted plain error.

¶ 2    The defendant, Jacob Fairbanks, appeals his conviction for possession of cannabis with intent to deliver. On appeal, the defendant argues that the trial court erred by failing to ensure that the jurors understood the four principles embodied in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The defendant acknowledges that counsel did not object to the trial court's questioning of the jurors, nor did counsel preserve the error in a posttrial motion, and thus, has forfeited this issue on appeal. The defendant, however, urges us to review this claim under the plain-error doctrine. For the following reasons, we affirm the judgment of the circuit court.

1

¶ 3                          I. BACKGROUND

¶ 4     The defendant was charged by indictment with one count of possession of cannabis with intent to deliver more than 10 grams, but not more than 30 grams, of cannabis, in violation of section 5(c) of the Cannabis Control Act (Act) (720 ILCS 550/5(c) (West 2018)). A jury trial was conducted on January 27 and 28, 2020, and the defendant was ultimately found guilty. During *voir dire*, the trial court questioned a panel of 24 potential jurors regarding the four principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The trial court specifically stated each of the four principles to the entire panel. The trial court then questioned each potential juror individually asking first if they heard the four principles, to which all stated "yes." During the trial court's individual questioning, it asked two potential jurors if they agreed with and accepted the four principles as true, and then asked the remaining 22 potential jurors if they accepted the principles as true. Each potential juror indicated "yes." From the first panel of 24 potential jurors, 12 were chosen to serve on the jury.

¶ 5     The trial court then questioned a second panel of 12 potential jurors to obtain an alternate juror. The trial court again specifically stated each of the four principles to the entire panel. The trial court then questioned each potential juror individually asking first if they heard the four principles, to which all stated "yes." During the trial court's individual questioning, it asked one potential juror if she agreed that the four principles were true and then asked the remaining 11 potential jurors if they accepted the principles as true. Again, each potential juror indicated "yes." From the second panel of 12 potential jurors, an alternate was chosen.

¶ 6     The defendant's jury trial continued with testimony presented by five witnesses. Gina Griffis testified that on September 19, 2018, she and an acquaintance met with the defendant at the Crossroads Bank's parking lot in Effingham, Illinois, to purchase cannabis from the defendant.

2

Griffis stated that she knew the defendant as "Banks" from working with him in the past. Griffis purchased cannabis from the defendant, but could not remember the amount, only that she gave the defendant $20 for the cannabis. Griffis testified that after she purchased the cannabis, a police officer pulled into the parking lot as Griffis was pulling out. According to Griffis, the police officer followed her for a couple of blocks and then stopped her vehicle. The police officer asked Griffis what she was doing, and she told the officer that she owed the defendant some money. Griffis testified that she did not owe the defendant any money, but that she told the officer that she did because she knew the officer would find the cannabis. Griffis testified that she did not want to tell the officer where she got the cannabis or what she was doing. On cross-examination, Griffis stated that she believed that she had contacted the defendant to purchase the cannabis. On redirect examination, Griffis reiterated that she did not know how much cannabis she purchased from the defendant, but assumed it was approximately one gram.

¶ 7     Effingham police officer Daniel Dust then testified that at approximately 1:51 p.m. on September 19, 2018, he responded to the parking lot of Crossroads Bank in Effingham, Illinois, after receiving a report of suspicious activity involving an orange pickup truck. As Officer Dust was pulling into the south entrance to the bank, he observed an orange truck preparing to leave the parking lot from the north exit. Upon his arrival, Officer Dust observed a pedestrian near the truck walking on the south end of the bank. According to Officer Dust, he was able to recognize and identify the pedestrian as the defendant from Officer Dust's prior contact with the defendant earlier that day. Officer Dust stated that he followed the truck in an attempt to initiate a traffic stop. He observed the driver commit a turn signal violation, stopped the truck, and approached its driver's side. Officer Dust identified the driver as Gina Griffis. According to Officer Dust, Griffis showed signs of nervousness, which to him was an indication of suspicious activity. Based upon Griffis's

3

behavior, Officer Dust requested Effingham Police Lieutenant Andy Warner[1] to bring his K-9 partner, Narco, to the scene to perform a K-9 free air search. While waiting for Lieutenant Warner to arrive, Officer Dust began completing a written warning for Griffis. Lieutenant Warner arrived at the scene and the K-9 performed the free air search, with the K-9 eventually alerting on the truck. Officer Dust acknowledged that he did not conduct the K-9 free air search, since he was not trained to use the K-9 partner.

¶ 8    After the K-9 alerted on the truck, Officer Dust and Lieutenant Warner searched the truck and located a backpack in the rear toolbox in the truck. The backpack was then searched, and two small bags of cannabis were found, which Officer Dust identified as People's Exhibit 1. Officer Dust testified that after finding the cannabis, he, Lieutenant Warner, Effingham police detective Andy Meyers, and Effingham police officer Jake Lustig went to the defendant's residence, expecting to find him there based on Officer Dust's prior knowledge of the defendant. According to Officer Dust, the defendant's residence was located directly across the street from the Crossroads Bank. Officer Dust stated that the defendant's residence was only three to five blocks aways from the location where he had stopped Griffis's truck.

¶ 9    Officer Dust testified that he knocked on the residence door but could not remember who answered the door. He was able to determine that the defendant and another individual were in the residence, and then the defendant exited the residence. Officer Dust placed the defendant under arrest based upon the information Officer Dust received during the traffic stop of the truck. According to Officer Dust, the defendant was placed in Officer Dust's squad car, and he observed the other three officers conduct a search of the residence. After the search, Officer Dust was

---

[1]At the time of the initial traffic stop, Lieutenant Warner held the rank of sergeant and Officer Dust referred to Lieutenant Warner and "Sergeant Warner" in Officer Dust's testimony.

provided a box containing a scale and a quantity of cannabis in a plastic bag, which Officer Dust identified as People's Exhibit 2. Once he returned to the police station, Officer Dust weighed the cannabis located in the defendant's residence, which weighed 30 grams. Officer Dust then identified People's Exhibit 3 as the scale located in the defendant's residence. On cross-examination, Officer Dust acknowledged that the defendant consented to the search of his residence and volunteered the location where the cannabis would be found.

¶ 10     Joshua Sterns then testified that he was employed with the Illinois State Police in its Forensic Science Laboratory in Springfield, Illinois. Mr. Sterns was certified as an expert in the field of forensic science. Mr. Sterns identified People's Exhibits 1 and 2, and testified regarding the testing procedures he performed on both exhibits. According to Mr. Sterns, he tested the substances found in both exhibits, which all tested positive for cannabis. Mr. Sterns also weighed the cannabis in the two plastic baggies in People's Exhibit 1, with the cannabis weighing 3.117 grams in total, and the cannabis in the plastic bag in People's Exhibit 2, with the cannabis weighing 23.816 grams.

¶ 11     Effingham Police Lieutenant Warner testified that on September 19, 2018, he was a sergeant with the Effingham police and a K-9 handler of his dog, Narco. Lieutenant Warner stated that at approximately 2 p.m. on September 19, 2018, he responded to the traffic stop of an orange pickup truck being conducted by Officer Dust. Lieutenant Warner stated that since he had the K-9, he was routinely asked to "back up" traffic stops. Upon arriving, Lieutenant Warner spoke with Officer Dust who requested a K-9 sniff test. Lieutenant Warner described how a K-9 sniff test is performed, the specific training he received with Narco, and his training in narcotics investigations overall. Turning to the instant traffic stop, Lieutenant Warner testified that he deployed Narco on the truck and observed Narco's behavior during the sniff test process. Lieutenant Warner stated

that, ultimately, Narco gave a "final response," indicating the presence of a narcotic. According to Lieutenant Warner, Narco gave his "final response" to the backpack located in the toolbox of the truck.

¶ 12 Lieutenant Warner then notified the other officers present, and they began a search of the truck. According to Lieutenant Warner, he searched the backpack first and found two clear plastic baggies containing a green leafy substance, which he believed to be cannabis. Lieutenant Warner then identified People's Exhibit 1 as being the two small plastic baggies of cannabis found in the backpack. Lieutenant Warner continued by stating that he and the other officers then traveled to the defendant's residence where another individual answered the door, and the defendant came to the door and then outside. Lieutenant Warner confirmed that Officer Dust placed the defendant under arrest and placed him in custody. According to Lieutenant Warner, he believed Detective Meyers requested permission from the defendant to search the residence, but that Lieutenant Warner was not present at that conversation.

¶ 13 Lieutenant Warner testified that he searched the residence, and in a hallway cupboard, he located a wooden box that contained a "larger, clear plastic bag, like Ziploc style bag" that contained a green leafy substance and a scale. Lieutenant Warner testified that, based upon his narcotics training, he believed the delivery of cannabis was being done at the residence. Lieutenant Warner based his belief on several factors, such as the presence of the cannabis and the scale being in close proximity, which he explained indicated the sale of cannabis because the scale would be used to take the cannabis from the large bag and make it into smaller bags for sale. Lieutenant Warner added that the scale was not big enough to weigh the large bag of cannabis. Further, Lieutenant Warner stated that the total weight amount of the cannabis being 30 grams could be indicative of sales rather than personal use. According to Lieutenant Warner, it would take a long

6

period of time to use such a large amount of cannabis for personal use because the cannabis would tend to "be stale or have a shelf life." Further, Lieutenant Warner testified that based upon his experience, the amount of cannabis found in the defendant's residence was not consistent with someone who only possessed cannabis for personal use. Usually, according to Lieutenant Warner, the amount for personal use would be "a much smaller amount like we found at the traffic stop." Lieutenant Warner stated various factors in support of his opinion, such as the costs of the cannabis, the difficulty of carry around such a large amount of cannabis if a person was only using a small amount, and the possibility the cannabis would start to age and lose its potency.

¶ 14 Lieutenant Warner then identified People's Exhibit 2 as the large bag of cannabis found in the defendant's residence. According to Lieutenant Warner, after he located the large bag of cannabis, he spoke with the defendant who claimed ownership of the items located in the wooden box being the cannabis and scale. Lieutenant Warner then identified People's Exhibit 3 as the scale located in the wooden box. He further testified that although he never had the opportunity to test the scale at the time of the defendant's arrest, Lieutenant Warner did observe cannabis residue on the scale.

¶ 15 Effingham Police Narcotics Detective Meyers was the last witness to testify and described his training and duties as a narcotics detective. Detective Meyers stated that on September 19, 2018, he responded to the traffic stop being conducted by Officer Dust and Lieutenant Warner. Detective Meyers observed the K-9 performing the free air sniff and then the search of the truck being executed. Detective Meyers stated that he personally observed the two bags of suspected cannabis that were located during the search. Detective Meyers continued, testifying that he had a conversation with Gina Griffis, and based upon that conversation, he and the other officers formed a plan to meet at the defendant's residence. According to Detective Meyers, the officers expected

7

to find the defendant at the residence, and Detective Meyers had seen the defendant earlier that day. Detective Meyers also confirmed that the defendant's residence was located directly across the street from Crossroads Bank.

¶ 16    Detective Meyers then testified that upon reaching the residence, the defendant was placed into custody, and that the defendant gave Detective Meyers consent to search the defendant's residence and personal belongings. During the search, a box was located, and a larger bag of cannabis and a digital scale were found in the box. According to Detective Meyers, based upon his training and experience, this indicated the sale of cannabis rather than for personal use. Detective Meyers explained that, with regard to the scales: "Usually drug dealers will weigh out the amount to make sure that they are not giving the buyer over or under what the agreed amount was." Detective Meyers further opined that the amount of cannabis found was not indicative of personal use, due to his experience with people "that they can be in possession of anywhere from 2.5, maybe even up to 5 grams of cannabis is the normal personal use that I've seen." Detective Meyers identified People's Exhibit 1 as the two bags of cannabis recovered during Griffis's traffic stop and People's Exhibit 2 as the large bag of cannabis recovered from the defendant's residence. Detective Meyers then testified regarding the coloration of the cannabis at the time of trial as being a "brownish yellowish color," indicating it was dried out and aged, rather than fresh.

¶ 17    The State rested its case-in-chief and the defendant moved for a directed verdict, which was denied by the trial court. After being properly admonished by the trial court and conferring with counsel, the defendant did not present any testimony or evidence. Counsel gave closing arguments to the jury and the trial court gave its instructions to the jury. After deliberations, the jury found the defendant guilty of possession with intent to deliver cannabis. The trial court subsequently sentenced the defendant to two years' imprisonment in the Illinois Department of

8

Corrections with a mandatory supervised release term of one year. The defendant filed a posttrial motion to reconsider on February 26, 2020. The defendant's posttrial motion did not contain an alleged error regarding the claim on appeal. This appeal followed.

¶ 18                                    II. ANALYSIS

¶ 19    The defendant's only contention on appeal centers on the trial court's questioning of the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Rule 431(b) ensures a defendant's right to a fair and impartial jury is realized. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 78. The rule requires trial courts to question jurors about their understanding and acceptance of four basic principles of law known as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)). Those principles are that (1) the defendant is presumed innocent, a presumption that stays with him throughout the proceedings; (2) the State is required to prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to prove his innocence; and (4) the defendant is not required to testify and, if he chooses not to do so, jurors may not draw any negative inferences from this fact. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (citing Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); see also *Zehr*, 103 Ill. 2d at 477. The trial court is required to give all prospective jurors an opportunity to indicate whether they both understand and accept each of these four principles. *Thompson*, 238 Ill. 2d at 607. While Rule 431(b) does not specify the manner in which jurors must be asked whether they understand and accept the four principles, it is clear that jurors must be asked those two simple questions: "do you understand" and "do you accept." *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 26. Review of compliance with Rule 431(b) is a purely legal question, subject to *de novo* review by this court. *People v. Belknap*, 2014 IL 117094, ¶ 41.

9

¶ 20    In this case, the trial court recited all four principles to the entire panel of prospective jurors and then individually questioned each prospective juror. The trial court asked each potential juror if they heard the four principles, to which all stated "yes." During the trial court's individual questioning, it asked two potential jurors if they agreed with and accepted the four principles as true, one potential juror if she agreed that the four principles were true, and the remaining 33 potential jurors if they accepted the principles as true. Each potential juror indicated "yes." However, the trial court did not ask any of the jurors whether they *understood* the *Zehr* principles. Thus, there is no dispute that the court did not fully comply with Rule 431(b). See *People v. Wilmington*, 2013 IL 112938, ¶ 32 (the trial court's failure to ask jurors if they understood the four *Zehr* principles is error in and of itself). The defendant acknowledges that he has forfeited appellate review of this claim by failing to object during *voir dire* or preserve the error in a posttrial motion. See *Belknap*, 2014 IL 117094, ¶ 47. The defendant asks this court to review his claim pursuant to the plain-error doctrine.

¶ 21    To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Here, the defendant did not object to the trial court's failure to comply with Rule 431(b) or include that issue in his posttrial motion. Accordingly, we agree that the defendant has forfeited appellate review of his claim.

¶ 22    The plain-error doctrine, however, allows a court of review to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). We will apply the plain-error doctrine when a clear or obvious error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so fundamental that it undermined the fairness of

10

the defendant's trial and threatened the integrity of the judicial process, regardless of the strength of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step of plain-error review is determining whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). Here, we have already concluded that the trial court erred in violating Rule 431(b) by failing to inquire whether the jurors understood the *Zehr* principles.

¶ 23 In plain-error review, the burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). The defendant argues the evidence in this case was closely balanced and, therefore, plain-error review is appropriate under the first prong of the plain-error analysis. We disagree.

¶ 24 Under first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice. *People v. Sebby*, 2017 IL 119445, ¶ 51. To determine whether the evidence at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a "qualitative, commonsense assessment" of it. *Id.* ¶ 53. That inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Considering whether evidence is closely balanced does not involve the sufficiency of the close evidence but, rather, the closeness of sufficient evidence. *Id.* ¶ 60.

¶ 25 Here, the defendant was charged with possession of more than 10 grams, but less than 30 grams, of cannabis with intent to deliver, pursuant to section 5(c) of the Act. 720 ILCS 550/5(c) (West 2018). The statute required the State to prove three elements: (1) that the drugs were in the defendant's immediate possession or control, (2) that the defendant knew that they were present, and (3) that the defendant intended to deliver them. *People v. Robinson*, 167 Ill. 2d 397, 407 (1995).

11

¶ 26     In support of his assertion that the evidence in this case was closely balanced, the defendant argues that the jury could have reasonably found that there was insufficient evidence to prove that the defendant intended to deliver the cannabis found inside the residence. Intent to deliver is necessarily proved by circumstantial evidence, and the reasonable inference of intent to deliver narcotics arises from the possession of contraband in excess of any amount that could be designed for personal use. *Id.* at 408. Other relevant factors include the defendant's possession of weapons, large amounts of cash, beepers, cellular telephones, and drug paraphernalia. *Id*.

¶ 27     The defendant argues that there was minimal circumstantial evidence to show that he possessed cannabis with the intent to deliver. The defendant argues that the earlier sale of three grams of cannabis to Gina Griffis was the only evidence that indicated that the defendant "may have" intended to deliver the cannabis found inside his residence.

¶ 28     The defendant argues that the testimony of Detective Meyers and Lieutenant Warner, that the amount of cannabis found in the defendant's residence was more consistent with the sale of rather than the personal use of cannabis, was inaccurate. The defendant claims that neither witness testified regarding how much cannabis could be consumed by a frequent cannabis user. In further support of his claim, the defendant argues that this court has recognized that more than 30 grams of cannabis is consistent with personal use. See *People v. McCarty*, 356 Ill. App. 3d 552, 565-66 (2005) (more than 30 grams of marijuana, standing alone, "could arguably represent several weeks' worth of a personal supply for a frequent user"). Further, the defendant argues that it is now legal for any individual over the age of 21 years old to possess up to 30 grams of cannabis, a legal recognition that this amount is consistent with personal use. See 410 ILCS 705/10-5(a)(1), 10-10(a)(1) (West 2020).

¶ 29    The defendant also argues that the "presence of the scale did not add enough probative value to the question of [the defendant's] intent to deliver." According to the defendant, even "[s]omeone who buys cannabis for his own use, without any intent to deliver, may be just as likely to possess a scale in order to make sure he has not been shorted by a dealer." See *People v. Warren*, 2016 IL App (4th) 120721-B, ¶ 31 (noting officer's testimony that some drug users use scales to avoid getting "shorted"). The defendant points out that there was no proof the scale was in functioning condition and, importantly, no other indicia of intent to deliver was found inside the defendant's residence, such as other packaging materials, cash, guns, or police scanners. The defendant asserts that based on the scarce amount of evidence found at the defendant's residence, the jury could have reasonably concluded that the defendant's earlier sale to Gina Griffis was a "one-off transaction with an old friend, and that the cannabis in the residence was not meant to be delivered."

¶ 30    The State argues that although the defendant attempts to provide an "innocent explanation" to the elements of the State's case, the defendant's explanations are speculative and not based on the evidence presented at trial. The State points out that this court has also described just over 28 grams of cannabis as a "hefty quantity"; however, we note that the court acknowledged in the same case that such quantity could arguably represent several weeks' worth of a personal supply for a frequent user. *McCarty*, 356 Ill. App. 3d at 566. Further, the State cites to another case where the possession of just over 28 grams of cannabis, in combination with expert testimony that the amount was 14 times larger than a typical amount for personal use and the fact that the defendant "carried no paraphernalia for personal use of the drugs," provided the jury with a sufficient basis to find the intent to deliver. See *People v. Blan*, 392 Ill. App. 3d 453, 457-58 (2009).

¶ 31 The State directs this court to the testimony that the defendant possessed 23.8 grams of cannabis and sold 3.1 grams of cannabis to Gina Griffis. Further, the testimony of Lieutenant Warner and Detective Meyers, in which they opined that the quantity of cannabis found in the defendant's residence was indicative of the sale, rather than personal use, of cannabis. The State refutes the defendant's contention that the large amount of cannabis found in his residence could be consistent with the personal use of a frequent cannabis user, pointing out that no evidence was presented that the defendant even used cannabis, let alone supported him being a frequent user. Regarding the scale found with the large bag of cannabis, the State argues that the scale had what appeared to be cannabis residue on it. The State also cites to the testimony of Lieutenant Warner, who stated that the scale was not big enough to weigh the large bag of cannabis, and the testimony of Detective Meyers that "drug dealers will weigh out the amount to make sure that they are not giving the buyer over or under what the agreed amount was."

¶ 32 The State urges this court to reject the defendant's reliance on *Warren*, 2016 IL App (4th) 120721-B, for the proposition that those personally using "may be just as likely to possess a scale in order to make sure he has not been shorted by a dealer." The State argues that no such similar testimony was presented in the instant case. In further support if this argument, the State argues that the scale was probative of intent to deliver, despite there being no evidence presented that the scale was functioning properly. The State argues that Lieutenant Warner's testimony was that there was cannabis residue on the small scale that was located with the large bag of cannabis. Finally, the State argues that the defendant's prior sale of three grams of cannabis to Gina Griffis is probative of the defendant's "intent to distribute it" and "his ongoing business of selling it." See *People v. LeCour*, 273 Ill. App. 3d 1003, 1009 (1995). The State directs this court to consider the

14

evidence presented that directly refutes the defendant's contention that his sale of cannabis to Gina Griffis was a "one-off transaction with an old friend."

¶ 33    We are not persuaded by the defendant's arguments and agree with the State. There was no evidence at trial that the defendant used, let alone was a heavy user of cannabis, to counter the State's evidence that the large amount of cannabis recovered was for distribution. There was also no evidence that Griffis was "an old friend" of the defendant. Although the defendant now argues these points on appeal, these arguments are not supported by the testimony at trial. Because we do not find the evidence to be so closely balanced that the Rule 431(b) error severely threatened to tip the scales of justice against the defendant, we decline to consider the defendant's claim under the plain-error doctrine.

¶ 34    Finally, although we have not found plain error in this matter, we encourage the trial courts to use the express terms enumerated in Rule 431(b) and remind the trial courts to question potential jurors whether they "understand" and "accept" the four principles of Rule 431(b).

¶ 35                                    III. CONCLUSION

¶ 36    For the foregoing reasons, we affirm the defendant's conviction.


¶ 37    Affirmed.